IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


KELLY FUERY, DEBRA SCIORTINO,      )
and NICOLE TOMASKOVIC,             )
                                   )
            Plaintiffs,            )
                                   )
      v.                           )   No. 07 C 5428
                                   )
CITY OF CHICAGO, *et al.*,          )
                                   )
            Defendants.            )


<u>MEMORANDUM OPINION AND ORDER</u>

     This case arises from a violent altercation between

Defendant William Szura ("Szura"), an off duty Chicago police

officer, and three women who were returning home for the gay

pride parade in Chicago, Illinois.[1]  Plaintiffs have sued Szura,

the City of Chicago, two Chicago police sergeants, and three

state police officers seeking relief under 42 U.S.C. § 1983 and

Illinois law.

     All Defendants other than Szura have moved for summary

judgment.[2]  I resolve the motions as follows: the City of

Chicago's motion (Dkt. No. 221) is granted only as to the

conspiracy claim (Count II); Sgt. Hitney's motion (Dkt. No. 224)

_____

[1] Although Szura is a police officer, I will refer to him as
"Szura" throughout this opinion so as not to prejudge whether he
was acting under color of law during the incident in question.
[2] With the exception of Section I.B., the term "Defendants" as
used in this opinion excludes Szura.

1

is granted; Sgt. O'Malley's motion (Dkt. No. 227) is granted; and the combined motion by Master Sgt. Weyforth, Sgt. Miloslavich, and Tpr. Aragones (Dkt. No. 231) is denied.

I.

The following facts are presented in the light most favorable to Plaintiffs. All evidentiary conflicts are resolved in their favor and I "accord[] [them] the benefit of all reasonable inferences that may be drawn from the record." *Coleman v. Donahoe*, 667 F.3d 835, 842 (7th Cir. 2012). "[My] account of the facts therefore is not necessarily true in an objective sense, but reflects the standard that applies to motions for summary judgment." *Id*

On June 24, 2007, Plaintiffs Kelly Fuery ("Fuery") and Debra Sciortino ("Sciortino") were traveling home on Interstate 55 around 7:00 pm after attending the gay pride parade in Chicago earlier that day. Fuery encountered a slow moving Honda Accord in the far left lane around the Damen Street exit. Szura, who had patrolled on horseback at the gay pride parade earlier that day, was driving the slow moving vehicle. *Id*. He was out of uniform and dressed in plain clothes.

After Fuery gave a "courtesy honk," Szura accelerated, but slammed on his brakes after looking in his rear view mirror. Szura blocked Fuery's attempts to pass him in the center lane and repeated this blocking technique when Fuery moved into the far

right lane.  Szura's vehicle came to almost a complete stop in
the far right lane, which forced Fuery to pull over on the
shoulder with the back end of her GMC Yukon still sticking out
into traffic.[3]

Once the two vehicles had stopped on the shoulder, Szura
jumped out of his car and started swearing at Fuery: "What the
fuck is your problem, you stupid fucking bitch?"  Fuery Dep. at
45:20-23.  Szura also screamed, "[D]o you know who you're fucking
with, you stupid fucking dyke?"  *Id*. at 56:13-14.  Fuery could
not get a word in edgewise during Szura's tirade.  His breath
reeked of alcohol and his speech was slurred.

Sciortino was still inside the Yukon when she noticed that
Szura was carrying a handgun.  Szura says he first identified
himself as a police officer after Sciortino shouted to Fuery,
"He's got a gun."  Szura Dep. 168:2-5.  In fact, Szura contends
that he was acting as a police officer throughout the
altercation.[4]

According to Fuery, Szura jabbed his gun into her stomach.
Thinking she was about to die, Fuery asked, "What are you going

---

[3] Although Szura tells a much different story about what
precipitated his confrontation with Plaintiffs--i.e., that Fuery
was tailgating him and threw something at his vehicle--I must
accept their version of events as true at the summary judgment
stage.
[4] CPD General Order No. 92-03 requires even off duty officers to
"take appropriate police action, which can be as little as
summoning the police for help, when observing a crime in
progress."  Pls.' Ex. 5.

to do, shoot me?" Fuery Dep. 58:15-16. Sciortino then pulled
Fuery back and stood in front of Szura's gun. As Sciortino was
pleading with Szura to put his gun away, he slapped her across
the face and threw her down into the far right lane of traffic.
As Fuery was kneeling down to check on Sciortino, Szura hit Fuery
in the back of the head, knocking her to the ground. Fuery then
heard Szura say, "If you know what's fucking good for you, you
stay the fuck down." *Id.* at 61:6-8.

After Fuery and Sciortino had gathered themselves, Fuery
asked Szura, "[D]o you get off on hitting women?" *Id.* at 62:6-7.
Szura responded, "You're not fucking women; you're fucking
dykes." *Id.* at 62:8-9.[5] After Sciortino stepped in the middle,
Szura slapped her again. Sciortino then called 911 and did not
hang up until police officers arrived on the scene. Meanwhile,
Szura chased Fuery in circles around her vehicle as she attempted
to retreat.

Shortly after Sciortino called 911, Plaintiff Nicole
Tomaskovic ("Tomaskovic") arrived at the scene. Tomaskovic had
attended the gay pride parade with Fuery and Sciortino earlier
that day and was driving behind them on I-55 en route to a
barbeque at their home. After spotting Fuery's vehicle on the

---

[5] Although neither woman disclosed her sexual orientation to
Szura, Sciortino was wearing a "gay friendly" t-shirt that
depicted two female silhouettes in a sexual position above text
that said, "How to train your bitch." Sciortino Dep. 166:13-
167:18.

4

side of the expressway, Tomaskovic pulled over at the next accident investigation site and left her vehicle to assess the situation.

When Tomaskovic arrived at the scene, Sciortino warned her to stay away because Szura had a gun. Fuery repeated this warning to Tomaskovic from the driver's seat of the Yukon: "[H]e's got a gun. We have to get Debbie in the car and get out of here." Tomaskovic Dep. 33:18-19. As Tomaskovic turned around, Szura charged at her, pinned her against the hood of the Yukon, and resumed his screaming about "bitches" and "dykes."

Fuery managed to pull Szura off of Tomaskovic and then got back inside the Yukon. As Fuery was attempting to move her vehicle, Szura jumped on the hood while calling 911. He identified himself as a police officer to the 911 operator and said he had "two DUIs." Szura's call resulted in a dispatch saying that an officer needed assistance. Meanwhile, Tomaskovic had also called 911 and reported that her attacker was "posing as a police officer." *Id*. at 43:24-44:5.

Once Fuery managed to escape and drove the Yukon into the accident investigation site, Szura put Tomaskovic in a choke hold. He threw her into Sciortino, which knocked both women to the ground. Szura then put his knee on Tomaskovic's chest, resumed choking her, and tried to wrestle her cell phone away.

A state police officer, Defendant Martin Miloslavich ("Sgt. Miloslavich"), arrived on the scene while Szura had Sciortino and Tomaskovic pinned on the ground. Szura called out, "I'm a police officer," and asked for a pair of handcuffs. Sciortino Dep. at 67:13-14. Szura had already warned Plaintiffs "numerous times" during the altercation that they were going to be arrested. Szura Dep. 162:3-9. Sgt. Miloslavich told Szura to back away and then handcuffed Sciortino and Tomaskovic without doing any investigation. He released them after they had calmed down and stopped crying.

Sgt. Miloslavich had already separated the parties when Defendant Gabriel Aragones ("Tpr. Aragones) and Jose DeAvila ("Tpr. DeAvila") reached the scene.[6] Plaintiffs explained their side of the story, as recounted above, to the state troopers. Tpr. Aragones or Tpr. DeAvila responded that they needed to wait for their supervisor, Defendant Stuart Weyforth ("Master Sgt. Weyforth"), to arrive before any decisions could be made.

Master Sgt. Weyforth was the last officer to arrive at the scene. After Plaintiffs were separated, each woman tried telling Master Sgt. Weyforth her side of the story. He was dismissive of their allegations and walked away before they had finished explaining what happened. Plaintiffs then witnessed Master Sgt.

---

[6] State Trooper Fidel Aguilar, an accident reconstruction specialist, was also present at the scene, but did not have film in his camera to take any photographs.

Weyforth laughing with Szura and pointing back at them.  When
Plaintiffs later told Master Sgt. Weyforth that they wanted to
press charges against Szura, he responded, "[H]e's one of us.
We're going to believe him over you."  Tomaskovic Dep. 52:16-21.

Defendant Kathleen O'Malley ("Sgt. O'Malley"), a Chicago
police sergeant, was also present at the scene.  Other than
asking Szura whether he was intoxicated and listening to his side
of the story, Sgt. O'Malley merely observed while the state
police conducted their investigation.  She never spoke with
Plaintiffs, who saw her standing around and laughing with Szura
instead of asking questions.

The last person Master Sgt. Weyforth consulted before
deciding whom to arrest was Sgt. Miloslavich, the first state
police officer on the scene.  Sgt. Miloslavich said he thought
Plaintiffs were the aggressors because they were swinging their
arms at Szura, who was standing over them, when he arrived at the
scene.  Master Sgt. Weyforth then told Plaintiffs that Szura was
pressing charges against them and instructed the state troopers
to place them under arrest.

Fuery was placed in a squad car by herself with Tpr. DeAvila
while Sciortino and Tomaskovic were transported together in a
separate vehicle.  During their drive to CPD's First District
station, Tpr. DeAvila told Fuery to document everything and call
an attorney because he did not think the situation was being

7

handled correctly. All three women declined to make written statements at the police station, but answered questions from the state troopers and allowed them to photograph their injuries. No Chicago police officers interviewed Plaintiffs.

At the station, Defendant Christine Hitney ("Sgt. Hitney") of the Chicago Police Department, filled out an Injury on Duty ("IOD") report based solely on Szura's version of events. In signing the IOD report, which is sent to an injured officer's supervisor and then forwarded to the Medical Services Section, Sgt. Hitney made the following certification: "I hereby certify that I have investigated the incident described above and attest to the truth and accuracy of the reported incidents and reports." Pls.' Ex. 16. In addition to completing the IOD report, Sgt. Hitney instructed an evidence technician to photograph Szura's injuries and had two CPD officers help him complete three Tactical Response Reports ("TRRs") documenting his use of force during the incident. Sgt. Hitney reviewed the completed TRRs for accuracy and legibility, but not substance. She then sent the TRRs to Lt. John Devereaux, the watch commander on duty that night, who was responsible for determining whether Szura's use of force was justified. Other than contacting Master Sgt. Weyforth to confirm that the state police were handling the investigation, Sgt. Hitney had no further involvement in investigating or documenting the incident.

Tpr. Aragones wrote the state police's report about the incident, which Master Sgt. Weyforth reviewed and approved. The most critical passage of the report reads:

> I spoke to Sgt. Miloslavich...He stated upon arriving on scene he observed Fuery, Sciortino and Tomaskovic on top of Szura striking him in the face and kicking him. Sgt. Miloslavich proceeded to remove Fuery, Sciortino and Tomaskovic from on top of Szura.

Pls.' Ex. 11.

Tpr. Aragones maintains that his report accurately reflects what Sgt. Miloslavich told him at the scene, which he then conveyed to Master Sgt. Weyforth. Aragones Dep. at 95:8-23, 121:13-122:2, 239:23-240:1. In contrast, Sgt. Miloslavich denies telling Tpr. Aragones that he witnessed Plaintiffs attacking Szura or that he physically separated the parties. Miloslavich Dep. 151:4-152:1. Sgt. Miloslavich contends that he simply recounted Szura's version of events to Tpr. Aragones, who incorrectly transformed Szura's statements into Sgt. Miloslavich's purported observations.[7] *Id*.

The State's Attorney ultimately prosecuted Plaintiffs for battering a police officer based in part on Tpr. Aragones's field report and criminal complaints that Szura signed in his capacity as a Chicago police officer. When announcing a verdict for Plaintiffs, the state trial judge commented on the discrepancy

---

[7] This explanation still leaves open the question of how Tpr. Aragones could have thought that Sgt. Miloslavich physically removed Plaintiffs from on top of Szura.

between Sgt. Miloslavich's testimony and the statements and actions attributed to him in the field report.

B.

The operative complaint in this case contains four claims under 42 U.S.C. § 1983 and five supplemental state law claims: Count I alleges that Defendants violated Plaintiffs' equal protection rights; Count II alleges that Defendants conspired to violate Plaintiffs' constitutional rights; Count III alleges that Defendants Szura and the City of Chicago used excessive force against Plaintiffs; Count IV alleges that Defendants falsely arrested and unlawfully detained Plaintiffs; Count V alleges that Defendants Szura and the City of Chicago violated the Illinois hate crimes statute, 720 ILCS § 5/12-7.1, *et seq.*; Count VI alleges that Defendants Szura and the City of Chicago assaulted and battered Plaintiffs; Count VI alleges that Defendants falsely arrested and imprisoned Plaintiffs in violation of Illinois law; Count VIII alleges that Defendants maliciously prosecuted Plaintiffs; and Count IX is an indemnification claim against the City of Chicago asserting that  Szura was acting within the scope of his employment at all relevant times.  *See* Dkt. No. 110 (Fourth Am. Compl.).[8]

---

[8] With respect to their federal claims (Counts I-IV), Plaintiffs allege that the City maintains policies, practices, or customs that caused their constitutional injuries.  *See Monell v. Dep't of Social Servs. of the City of New York*, 436 U.S. 658 (1978).  I bifurcated these *Monell* claims pending resolution of the

II.

With the exception of Szura, Defendants have moved for summary judgment on all claims asserted against them. Summary judgment is appropriate only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In evaluating a motion for summary judgment, the district court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007). I must deny a motion for summary judgment when the evidence, viewed in the light most favorable to Plaintiffs, "is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A.

The City of Chicago ("City") has moved for summary judgment on the grounds that Szura was not acting under color of state law (Counts I-IV) or within the scope of his employment (Counts V-IX) during the June 24, 2007 incident.[9]

_____

individual claims. *See* Dkt. No. 217.

[9] The City says it intends to seek summary judgment on the *Monell* claims (Counts I-IV) on other grounds at a later date if I reject its argument that Szura was not acting under color of state law. *See* Dkt. No. 223 at 2 n.3.

"Section 1983 provides a cause of action against any person who deprives an individual of federally guaranteed rights 'under color' of state law." *Filarksy v. Delia*, 132 S.Ct. 1657, 1661 (2012). "[A police officer's] being off-duty does not preclude him from acting under color of state law." *Greco v. Guss*, 775 F.2d 161, 168 (7th Cir. 1985). "The important consideration…in determining whether an officer is acting under color of state law is the nature of the specific acts performed." *Latuszkin v. City of Chicago*, 250 F.3d 502, 505-6 (7th Cir. 2001).

Here, Szura subjectively believed that he was acting as a Chicago police officer throughout the altercation. There is also record evidence that Szura identified himself as an officer at least three times while performing police actions: (1) when Szura first displayed his weapon; (2) while Szura was on the phone with a 911 operator, which triggered a dispatch saying that an officer needed assistance; and (3) when Sgt. Miloslavich arrived on the scene and Szura asked him for handcuffs to make an arrest.[10] Szura also warned Plaintiffs "numerous times" during their altercation that they were going to be arrested for battery. A reasonable jury could conclude from these facts that Szura acted

---

[10] There is record evidence contradicting the City's contention that Plaintiffs never heard Szura identify himself as a police officer. Sciortino reported to a 911 operator during the fight that Szura was "posing as a police officer." Sciortino Dep. at 43:24-44:5.

under color of state law.  *See Flood v. Carey*, No. 06 C 2980,

2011 WL 5866260, at *4 (N.D. Ill. Nov. 21, 2011) (Gottschall, J.)

(denying City's motion for summary judgment on Sec. 1983 claim

against intoxicated off duty officer who, like Szura, allegedly

observed plaintiff commit a crime while driving, announced

himself as a police officer, and used his personal weapon while

attempting to make an arrest).[11]

My holding is consistent with *Latuszkin*, the precedent upon

which the City relies most heavily.  The off duty officer in

*Lauszkin*, unlike Szura, had not "displayed any police power."

250 F.3d at 506 (affirming dismissal of Sec. 1983 claim under

Rule 12(b)(6)).  The City's other cited cases involving off duty

police officers are also factually distinguishable.  *See Mendez*

*v. Vill. of Tinley Park*, No. 07 C 6498, 2008 WL 427791, at *2

(N.D. Ill. Feb. 14, 2008) (dismissing Sec. 1983 claim against off

duty officer who, unlike Szura, "was not performing or attempting

to perform any police activity such as attempting to arrest

---

[11] *See also Coles v. City of Chicago*, 361 F.Supp.2d 740, 743 (N.D.
Ill. 2005) (denying summary judgment on Sec. 1983 claim against
off duty officer who announced his office during a bar fight
because record contained factual disputes about "the manner,
frequency, and purpose of the announcement"); *Butler v. Corral*,
No. 98 C 802, 1999 WL 1069246, at *5 (N.D. Ill. Nov. 22, 1999)
(denying summary judgment on Sec. 1983 claim against off duty
officer who was involved in a fight because reasonable jury could
find that "by threatening arrest, [defendant] was implicitly
conveying that he was a police officer and invoking the powers of
his office").

[plaintiff]"); *Lyons v. Adams*, 257 F.Supp.2d 1125, 1133 (N.D. Ill. 2003) (granting summary judgment on Sec. 1983 claim to off duty police officers involved in a bar fight who, unlike Szura, "did not identify themselves as police officers" and "did not inform [plaintiffs] that they were under arrest"); *Zienciuk v. City of Chicago*, No. 01 C 3769, 2002 WL 1998309, (N.D. Ill. Aug. 28, 2002) (same).

Therefore, the City's motion for summary judgment on Counts I-IV is denied because a reasonable jury could find that Szura acted under color of state law during the altercation.

2.

The City has also moved for summary judgment on the state law claims (Counts V-IX) on the ground that Szura was not acting within the scope of his employment.  The scope of employment analysis is the same for purposes of *respondeat superior* liability (Counts V-VIII) and indemnification (Count IX) under the Tort Immunity Act, 745 ILCS § 10/9-102.  *See Lyons*, 257 F.Supp.2d at 1138-39.

"Under *respondeat superior,* an employer's vicarious liability extends to the negligent, willful, malicious or even criminal acts of its employees, when those acts are committed within the scope of employment."  *Adames v. Sheahan*, 909 N.E.2d 742, 755 (Ill. 2009).  "Illinois courts look to the Second

Restatement of Agency...for guidance in determining whether an employee's acts are within the scope of employment." *Id*.

> Conduct of servant is within the scope of employment if, but only if: (a) it is of the kind he is employed to perform; (b) it occurs substantially within the authorized time and space limits; [and] (c) it is actuated, at least in part, by a purpose to serve the master.

*Id*. (quoting Restatement (Second) of Agency § 228(1) (1958)). "[A]ll three criteria...must be met in order to conclude that an employee was acting within the scope of employment." *Id*.[12]

This case is consistent with the Illinois Supreme Court's observation that "[s]ummary judgment is generally inappropriate when scope of employment is at issue." *Pyne v. Witmer*, 543 N.E.2d 1304, 1308 (Ill. 1989). As an initial matter, the Injury on Duty report is strong evidence that even the City thought Szura was acting within the scope of his employment during the altercation on I-55. *See* Pls.' Ex. 16 ("IOD report") (noting that Szura was injured "after he announced his Office"). Szura's subjective belief that he was acting as a Chicago police officer during the incident and its aftermath also cuts against the City's argument. *See Lyons*, 257 F.Supp.2d at 1140 (noting "the

---

[12] The Illinois Supreme Court has not adopted the fourth factor listed in Section 228 of the Restatement (Second) of Agency for determining the scope of employment issue; that is, "if force is intentionally used by the servant against another, [whether] the use of force is not unexpectable by the master."

importance of the defendant's subjective intent to the scope of employment issue under Illinois law").

Turning to the Restatement factors, Szura described his job as "do[ing] everything on horseback as a patrolman would do in [a] squad car." Szura Dep. at 23:12-16. Szura's patrol duties distinguish this case from situations where courts have held that an off duty officer's actions were not "of the kind" he was employed to perform.[13] Second, CPD General Order 92-03 requires off duty officers to "take appropriate police action, which can be as little as summoning the police for help, when observing a crime in progress." Pls.' Ex. 5.[14] A jury could therefore find that Szura acted within authorized time and space limits. With regard to the third Restatement factor, Szura's warnings to Plaintiffs that they were going to be arrested suggest that he acted, at least in part, to serve a law enforcement purpose. *See Flood*, 2011 WL 5866260 at *5 (denying City's motion for summary

---

[13] *See e.g., Rivera v. City of Chicago*, 2005 WL 2739180, at *5-6 (N.D. Ill. Oct. 24, 2005) (holding that off duty Chicago police officer employed in non-emergency call center with no patrol duties acted outside the scope of his employment when he falsely claimed to have a search warrant and then ransacked plaintiff's home); *Luna v. Meinke*, 844 F.Supp. 1284, 1288 (N.D. Ill. 1994) (holding that off duty Chicago police officer employed as mayor's driver with no patrol duties acted outside scope of his employment when he pulled over vehicle and attacked driver), *aff'd on other grounds*, 42 F.3d 1391 (7th Cir. 1994).
[14] The City's reliance on CPD Special Order No. 97-4, which states that Chicago police are not responsible for investigating incidents on I-55 subject to several exceptions, merely highlights that whether Szura acted within time and space limits is a disputed issue of fact.

judgment on state tort claims because off duty officer's contention that he was trying to arrest plaintiff "arguably indicates a purpose to serve his employer").

In sum, the City's motion for summary judgment on Counts V-IX is denied because a reasonable jury could find that Szura acted within the scope of his employment.

3.

I turn now to the City's argument for summary judgment on Count II, which alleges a conspiracy to deprive Plaintiffs of their constitutional rights.

The conspiracy claim (Count II) is far from a model of draftsmanship. In opposing the City's motion for summary judgment, Plaintiffs state that their conspiracy claim is "grounded" in a "common venture" among Defendants "to protect Szura from investigation, discipline, and criminal prosecution." Dkt. No. 250 at 25-26. In furtherance of this alleged conspiracy, Plaintiffs contend that Defendants falsely arrested and prosecuted them for misdemeanor battery. *Id*.

Setting aside whether Plaintiffs have presented evidence of an agreement--the ground on which the City seeks summary judgment--I find that the conspiracy claim fails as a matter of law. The alleged conspiracy "to protect Szura from investigation, discipline, and criminal prosecution" does not violate any constitutional rights. Stated differently,

Plaintiffs have no constitutional right to have Szura investigated, discipline, or prosecuted. *See Linda R.S. v. Richard D.*, 410 U.S. 614 (1973) ("[A] private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another."); *see also Alexander v. City of South Bend*, 433 F.3d 550, 555 (7th Cir. 2006) ("The Constitution does not require that...witness interviews meet a particular standard of quality."). Although one act taken in furtherance of the alleged conspiracy states a constitutional violation—which Plaintiffs are already pursuing in their false arrest claim (Count IV)—an agreement to protect Szura from punishment does not violate any constitutional rights.

"Where no constitutional rights are denied by the alleged conspiracy, there can be no section 1983 liability for conspiracy." *Young v. Cook County*, No. 07 C 0533, 2007 WL 1704287, at *5 (N.D. Ill. June 8, 2007). Thus, Count II is dismissed in its entirety.[15]

4.

The City's final argument for summary judgment is that it neither arrested (Counts IV and VII) nor prosecuted (Count VIII) Plaintiffs, nor influenced the State's decisions to do so.

---

[15] I hold only that the object of alleged conspiracy does not violate any constitutional rights. I take no position on whether the alleged conspiracy is a custom, policy, or practice under *Monell* that caused a separate constitutional injury.

18

Plaintiffs counter that the City was "personally involved" in their arrests and prosecutions. Dkt. No. 250 at 26 (citing *Jones v. City of Chicago*, 856 F.2d 985, 992-93 (7th Cir. 1988)). This debate is entirely academic given that the City will remain potentially liable under Count IV (based on a *Monell* theory) and Counts VII-VIII (based on *respondeat superior*) no matter how I rule on whether the Chicago police were "personally involved" in the arrest and prosecution decisions. *See supra* at §§ II.A.1-2. Thus, the City's attempt to secure summary judgment on the false arrest and malicious prosecution claims is denied as moot.

B.

Sgts. O'Malley and Hitney have filed separate motions for summary judgment on the claims against them (Counts I-II, IV, and VII-VIII).[16] Sgt. O'Malley argues that she did nothing more than arrive at the scene and observe the Illinois state police conduct an investigation. Similarly, Sgt. Hitney argues that she merely assisted in the preparation of an Injury on Duty ("IOD") report and Tactical Response Reports ("TRR") and was not involved in the decisions to arrest or prosecute Plaintiffs for misdemeanor battery.

---

[16] I have already disposed of the conspiracy claim (Count II) above. Plaintiffs have voluntarily dismissed their equal protection claims (Count I) against Sgts. O'Malley and Hitney, so my analysis is limited to their arguments for summary judgment on the false arrest (Counts IV and VII) and malicious prosecution claims (Count VIII).

With respect to Sgt. O'Malley, Plaintiffs argue that she "was there during everything that happened. Had she taken action, she could have changed the situation. She did nothing and helped cover it up." Dkt. No. 257 at 3; *see also id.* at 9 (speculating that if Sgt. O'Malley had conducted her own investigation at the scene, Szura rather than Plaintiffs would have been arrested and prosecuted). Sgt. Hitney's alleged failures are similar: "Plaintiffs were detained and prosecuted instead of Officer Szura because Defendant Hitney failed to meet her obligation to investigate the incident pursuant to Chicago Police Department Rules." Dkt. No. 260-1 at 3.

These arguments have no merit. Plaintiffs concede that their false arrest and malicious prosecution claims require evidence that Sgt. O'Malley and Sgt. Hitney were "personally involved" in these decisions.[17] However, Sgt. O'Malley's inaction at the scene and Sgt. Hitney's inaction at the station show the exact opposite of personal involvement. *Cf. Jones*, 856 F.2d at 993 (affirming jury verdict on false arrest and malicious prosecution claims based on evidence that police supervisors knew

---

[17] *See Jones*, 856 F.2d at 992 ("The supervisors must know about the [mis]conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see."); *see also Rodgers v. Peoples Gas, Light & Coke Co.*, 733 N.E.2d 835, 842 (Ill. App. Ct. 2000) ("liability [for malicious prosecution] extends to all persons who played a significant role in causing the prosecution of the plaintiff, provided all of the elements of the tort are present").

and approved of "every false step taken by the subordinate officers," hid a report with exculpatory information, and "sign[ed] a deceitful report for use by the prosecution"). There is no evidence supporting the allegation that Sgts. O'Malley and Hitney "fabricated" evidence; to the contrary, the record establishes that they failed to gather any evidence beyond Szura's side of the story. Whether CPD General Orders required Sgt. O'Malley or Sgt. Hitney to do more than observe and complete paperwork is beside the point. *See Scott v. Edinburg*, 346 F.3d 752, 760 (7th Cir. 2003) ("[Section 1983] protects plaintiffs from constitutional violations, not violations of state laws or, in this case, departmental regulations and police practices"); *Gramenos v. Jewel Cos., Inc.*, 797 F.2d 432, 442 (7th Cir. 1986) ("[T]he police need not automatically interview available witnesses, on pain of the risk that a jury will require them to pay damages. Good police practice may require interviews, but the Constitution does not require police to follow the best recommended practices.").

At worst, Sgt. O'Malley and Sgt. Hitney were negligent in failing to conduct their own investigations of the underlying facts, but the Seventh Circuit has squarely rejected this theory of liability: "[S]upervisors who are merely negligent in failing to detect and prevent subordinates' misconduct are not liable, because negligence is no longer culpable under [S]ection 1983."

*Jones*, 856 F.2d at 992; *see also Loubser v. Thacker*, 440 F.3d 437, 442 (7th Cir. 2006) ("Section 1983 claims cannot be founded on negligence.").

On these facts, no reasonable jury could conclude that Sgt. O'Malley or Sgt. Hitney was "personally involved" in having Plaintiffs falsely arrested or maliciously prosecuted. Therefore, I grant their respective motions for summary judgment.

C.

The Illinois State Police Defendants--i.e., Sr. Master Sgt. Stuart Weyforth, Sgt. Martin Miloslavic, and State Trooper Gabriel Aragones (collectively, "the ISP Defendants")--have moved for summary judgment on the following grounds: (1) Plaintiffs have no evidence that the ISP Defendants discriminated against them in violation of the equal protection clause (Count I) or formed a conspiracy to violate their constitutional rights (Count II); (2) the ISP Defendants had probable cause to arrest Plaintiffs, which would serve as an absolute bar to the false arrest (Counts IV and VII) and malicious prosecution (Count VIII) claims; and (3) qualified immunity shields the ISP Defendants from liability.

Plaintiffs have voluntarily dismissed their equal protection claim against the ISP Defendants. *See* Dkt. No. 259 at 1 n.1. I have already disposed of the conspiracy claim, so my analysis of

the ISP Defendants' motion for summary judgment is limited to the issues of probable cause and qualified immunity.

1.

"[T]he existence of probable cause for arrest is an absolute bar to a Section 1983 claim for unlawful arrest, false imprisonment, or malicious prosecution." *Schertz v. Waupaca Cty.*, 875 F.2d 578, 582 (7th Cir. 1989). "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). "[A]n arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause." *Id*. at 153. In determining whether probable cause existed, "the court must consider the facts as they reasonably appeared to the arresting officer, seeing what he saw, hearing what he heard, and so forth." *Holmes v. Village of Hoffman Estates*, 511 F.3d 673, 679 (7th Cir. 2007).

Here, I cannot decide on summary whether the ISP Defendants had probable cause to arrest Plaintiffs because there is a factual dispute about what they saw and heard at the scene. Recall that Tpr. Aragones's final report, which Master Sgt. Weyforth reviewed for accuracy, states that Sgt. Miloslavich witnessed Plaintiffs on top of Szura when he arrived. Sgt. Miloslavich denies making any such observation or telling Tpr.

23

Aragones that he had.  Summary judgment on the issue of probable cause is inappropriate when the arresting officers present conflicting testimony about what they observed at the scene.  *See Morfin v. City of East Chicago*, 349 F.3d 989, 999-1000 (7th Cir. 2003) (reversing grant of summary judgment on false arrest claim where several arresting officers testified that plaintiff made threatening, hostile statements at the scene, but another officer testified that plaintiff never raised his voice).

Similarly, I cannot decide on summary judgment whether the ISP Defendants "arguably" had probable cause to arrest Plaintiffs, which would entitle them to qualified immunity, because of the glaring dispute over the facts and circumstances as they appeared to the arresting officers.  *See Humphrey v. Staszak*, 148 F.3d 719, 725 (7th Cir. 1998) ("Arguable probable cause exists when a reasonable police officer in the same circumstances and with the same knowledge and possessing the same knowledge as the officer in question *could* have reasonably believed that probable cause existed in light of well-established law." (internal quotation omitted)).

2.

The ISP Defendants also argue that summary judgment should be granted on the malicious prosecution claim (Count VIII) because there is no evidence that they acted with malice.

Although the ISP Defendants attempt to characterize the discrepancy between Sgt. Miloslavich's testimony and the observations attributed to him in the report as a "mistake" devoid of malice, a reasonable jury could reach the opposite conclusion based on Master Sgt. Weyforth's suggestion that he was going to protect a fellow officer against Plaintiffs' accusations. In short, I cannot decide on summary judgment whether the ISP Defendants made an innocent mistake in their police report or whether they acted with malice to have Plaintiffs prosecuted for misdemeanor battery.

III.

I resolve the pending motions for summary judgment as follows for the reasons stated above: the City of Chicago's motion (Dkt. No. 221) is granted in part only as to the conspiracy claim (Count II); Sgt. Hitney's motion (Dkt. No. 224) is granted; Sgt. O'Malley's motion (Dkt. No. 227) is granted; and the combined motion by Master Sgt. Weyforth, Sgt. Miloslavich, and Tpr. Aragones (Dkt. No. 231) is denied.

**ENTER ORDER:**

Elaine E. Bucklo
United States District Judge

Dated: March 25, 2014