IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KELLY FUERY, DEBRA SCIORTINO, and NICOLE TOMASKOVIC, | |
| Plaintiffs, | |
| v. | Case No.: 07 C 5428 |
| CITY OF CHICAGO, *et al.*, | Honorable Judge Ellis |
| Defendants. | |

**PLAINTIFF NICOLE TOMASKOVIC'S MOTION TO COMPEL
DEPOSITION OF RAHM EMANUEL**

Plaintiff Nicole Tomaskovic, through her undersigned counsel, moves pursuant to Federal Rules of Civil Procedure 37(a), (d), and 45 for entry of an order compelling the deposition of Rahm Emanuel. In support, Plaintiff states as follows:

1. This case involves claims by Plaintiff against both the individual defendant Officer William Szura and the City of Chicago. On October 15, 2012, the Court bifurcated discovery and trial of Plaintiff's *Monell* claims against the City of Chicago. *See* Dkt. 212. The Court also subsequently denied Plaintiff's motion to reconsider the bifurcation. *See* Dkt. 341.

2. In December 2015, a jury trial was held on Plaintiff's claims. On January 6, 2016, the Court entered judgment in this case on the jury's verdict in favor of Plaintiff Nicole Tomaskovic and against Defendant William Szura on Claim 1, and in favor of Defendants on all other claims. The jury also found that William Szura was acting

under "color of law" and "within the scope of employment" as a City of Chicago Police Officer when he engaged in excessive force against Tomaskovic. *See* Dkt. 424.

3. Because the jury found in favor of Tomaskovic on her claim for excessive force against Szura, Tomaskovic is now able to proceed with her *Monell* claim against the City of Chicago, which remains pending. *See* Dkt. 428.

4. In the time since the Court bifurcated the *Monell* claim, additional relevant information has come to light that necessitates Plaintiff being allowed to take Mayor Rahm Emanuel's deposition.

5. On December 9, 2015, only days before trial began on Plaintiff's claims, Mayor Rahm Emanuel delivered a speech to the City Council in which he admitted, among other things, that a code of silence exists and has existed within the Chicago Police Department:

> This problem is sometimes referred to as the Thin Blue Line. Other times it is referred to as the code of silence. It is the tendency to ignore, deny or in some cases cover-up the bad actions of a colleague or colleagues.
> No officer should be allowed to behave as if they are above the law just because they are responsible for upholding the law.
> *Permitting and protecting even the smallest acts of abuse by a tiny fraction of our officers leads to a culture where extreme acts of abuse are more likely.* . . .

*See* Exhibit 1 (12/9/15 Remarks of Emanuel), at 6 (emphasis added). The Mayor also admitted that "[s]upervision and leadership in the police department and the oversight agencies that were in place failed," and that "Our city has been down this road before." *Id.* Notably, Mayor Emanuel also stated that he intended to create a task force to

2

examine these failures within the Independent Police Review Authority that would reach back to at least 2007, which is when Officer Szura engaged in excessive force in this case. Exhibit 1, at 5.

6. Mayor Emanuel's admissions are consistent with Plaintiff's expert's opinions in this case, in which Plaintiff's expert also found among the following, which are worth citing certain excerpts in full to show the long-standing custom and practice:

> . . . . [I]t is my opinion to a reasonable degree of professional certainty that the performance of Command, supervisory and investigative personnel of the CPD, and IPRA/OPS did not conform to generally accepted practices and procedures for professional law enforcement agencies. Using the examples identified above, it is further my opinion that the supervisory and disciplinary systems not only allowed the crimes to continue, but actually encouraged them.
>
> . . . . It is only reasonable to believe that any officer in the CPD would believe that the culture of the department would protect them even when they acted criminally. Other examples are reflected in the jury's verdict in *George Garcia v. City of Chicago*, No. 01 C 8945 as discussed above, and in the more recent verdict in *Obrycka v. City of Chicago*, No. 07 C 2372 in the Northern District of Illinois, where the jury found that the City of Chicago through its police department had a widespread custom or practice of failing to adequately investigate and/or discipline its officers and/or of a police code of silence.
>
> * * *
>
> It is my opinion that this sorry state of affairs has been permitted to continue because the City of Chicago does not want it fixed. In deposition after deposition, by persons in charge of this department, those in charge of the units that conduct the investigations and by those who actually are responsible for conducting the investigations, there is an acknowledgement that high profile cases and/or cases which have garnered significant media attention are handled with greater attention throughout the chain of investigation and command. This is a tacit admission on the part of the members of this system that it means that when no one is looking its business as usual. That business is haphazard

investigations, where the City of Chicago and CPD does not want to find out the truth about police misconduct. The result is exactly what the City of Chicago and CPD seek in the exoneration of the officers in an overwhelming majority of complaints filed by citizens (through not sustained, unfounded or exonerated findings when citizens complain about police misconduct).

\* \* \*

It is difficult to deny that there is a need within the CPD to be vigilant for patterns of abuse, corruption, and/ or the violation of constitutional rights especially imperative in light of the historical record of corruption and abuse of the public by some members of the department. . . .

\* \* \*

In 1999, 2 years after the Webb Commission, Superintendent Hilliard requested a study of the CPD by Marshall Law School. That study was conducted under the direction of Robert G. Johnson. Among other findings in that study was the recognition that there was a need for improvements in the way allegations of an officers' misconduct were investigated.

In 2000, 3 years after the Webb Commission recommendations, Alderman William Beavers, of the 7th District, once again alerted the CPD about the need for a system that could identify patterns and provide an early warning.

In 2003, 6 years after the Webb Commission, Lori Lightfoot, the director of OPS wrote a memo in which she outlined how patterns of not sustained excessive force complaints should be examined. My review of CRs indicates that this review never materialized. In addition there was no analysis of CRs which looked for or recognized patterns in complaints regarding criminal behaviors such as warrantless/illegal searches, stealing of money or valuables, planting drugs on suspects.

Regarding cases which involved off duty officers like Officer Szura in this matter. On May 2, 2003, a jury in the case of *George Garcia v. City of Chicago*, No. 01 C 8945 in the United States District Court, Northern District of Illinois, found that the City of Chicago maintained a custom and practice of not adequately investigating, disciplining, or prosecuting off-duty Chicago police officers who use excessive force against individuals. Judge Holderman, found that the City's police abuse "investigations were incomplete, inconsistent, delayed, and slanted in

4

favor of the officers." *Garcia v. City of Chicago*, 2003 U.S. Dist. LEXIS 16565 at *5 (N.D.Ill. Sep. 19, 2003).

\* \* \*

In 2007 in recognition of the problems that existed in the then current system for addressing investigating complaints of police misconduct an ordinance was passed. Because OPS had been such a colossal failure, had not conducted thorough investigations, and did not enjoy the confidence of the citizens of Chicago. . . , it was replaced by IPRA.

Once again true reform was substituted for smoke and mirrors to fool the public. Other than a name change and who IPRA would report to it was OPS under a different name. It was exactly the same personnel doing exactly the same things. In order to be sure that there was no confusion and to ensure it would continue to be business as usual, the operating manual for OPS remained, and still remains in effect until as late as February of 2103. They did not even bother to print a revised manual with a name change.

Regarding the change of who IPRA reports to: that change was to remove IPRA/OPS from being under the Superintendent of Police and place it directly under the office of the Mayor. . . .

As discussed above, it is my opinion to a reasonable degree of professional certainty that the performance of Command, supervisory and investigative personnel of the CPD, and IPRA/OPS did not conform to generally accepted practices and procedures for professional law enforcement agencies. Using the examples identified above, it is further my opinion that the supervisory and disciplinary systems not only allowed the crimes to continue, but actually encouraged them.

\* \* \*

In the more than a 1,300 CR's I have reviewed there is no record or indication that one commander in the review chain ever made a single effort to have these obvious deficiencies corrected.

It is my opinion, to a reasonable degree of professional certainty, that there is an organizational culture within the Chicago Police Department that holds the wellbeing and interests of the Chicago Police Department above the needs and rights of the public it is intended to protect and serve.

In deposition taken for the matter of *Padilla vs. City of Chicago* Deputy Assistant Superintendent Kirby stated that there has to be a balance

5

between the City's interests and the citizens' interests. The decision regarding this balance is made by the head of IAD and the Superintendent of the CPD. The generally accepted purpose for police departments like the CPD is that they exist to serve the interests of the citizens. Whenever any interests of the CPD are more important than the interests of the citizens it exists to serve, the City and CPD has lost its way.

A further example of the attitude that is prevalent in the CPD was expressed by Victor Guerrieri the former tactical commander of SOS when he stated that the main function of a supervisor was to take care of subordinates. Once again there is no mention of serving and protecting the citizens and insuring their safety, including safety from rogue police officers.

These actions and attitudes at the highest levels of the Chicago Police Department and the City, *up to the Mayor*, are indicative of the pervasive culture within the City and the CPD. This culture permeates the City and the Police Department and influences its every activity as it relates to the Police Department. It is my opinion that it is this pervasive culture that allowed, encouraged and emboldened Officer Szura to believe that he could act with impunity if he acted in the ways alleged by the Plaintiffs in the matter, and even based on some of Officer Szura's own admissions. The effects of this culture spread all the way to the *Mayor's* Office. When then Mayor Dailey was confronted with the report that members of SOS were plotting to assassinate other police officers who might testify against them, he stated "it troubled him that one little incident could overshadow the good work done by the CPD." This culture continues under the *current Mayor*.

Even as of February 2013, the operating manual for OPS still remains in effect. They did not even bother to print a revised manual with a name change.

It is further my opinion that this organizational culture is contrary to the generally accepted practices and procedures for professional police organizations. It is my opinion that this culture has prevented the City and the CPD from identifying and disciplining CPD members when they abuse members of the public. It is further my opinion that these failures embolden individual police officers of the CPD, like Officer Szura, to act with impunity when they carry out these abuses. As a result of this culture, officers who violate the law and/or generally accepted practices

6

and procedures for professional police officers would be confident that their actions will not be identified and/or punished by the Chicago Police Department, OPS/IPRA, the *Mayor*, or the City.

* * *

In professional police departments, it is essential that supervisory and command structures work to ensure that their subordinates understand that they are not above the law. The environment and culture of the CPD tells its officers that exactly the opposite is true. . . . The materials that I have reviewed in this case and in others consistently show that the supervisory and command structures with the CPD have not done their jobs to stop abuses and control CPD officers. In fact, many of the materials have shown that the supervisors, CPD, OPS/IPRA, and the City have condoned and furthered this culture.

It is my opinion that a culture of this nature does not occur overnight or in a vacuum. It is the result of a history of abuses that have not been corrected. It is a result of the ongoing history of the CPD. It is my opinion that this history sets a precedent for the officers of the CPD; a precedent that causes them to believe that they can violate the rights of the citizens they are sworn to protect. It is a precedent that causes them to believe that there will be no consequences or repercussions for their actions no matter how far outside of the generally accepted practice for professional police officers those actions might be.

An example of the actual ramifications of this culture is clearly seen in the Guilty Plea of Officer James McGovern. He confessed to what was done to locate money that could be stolen by the SOS officers. McGovern admitted that when they were questioning a suspect in a drug investigation they denied the suspect, who was an insulin dependent diabetic, access to his insulin until the suspect told them where the money was.

In the SOS scandal Officer Herrera stated that on the first occasion when he was given money that he knew was stolen from drug dealers he had qualms about accepting it. The thought process that allowed him to overcome these qualms and take the stolen proceeds from drug sales included the realization that if he was caught those above him in the police department would cover up for him.

This is the same realization that an Officer like Officer Szura would have when he engaged in the conduct attributed to him by [Plaintiff Tomaskociv] in this matter. In fact, Officer Szura admitted that he did not

>have any concerns that he would be disciplined as a result of Plaintiff's complaints of the incident on I55. (Szura Deposition p. 110)

Exhibit 2, Stine Report (internal citations omitted and emphasis added).

7. The only claim remaining for trial in this case is Tomaskovic's *Monell* claim against the City of Chicago. In order to prove this claim, Tomaskovic must prove that Szura's conduct was the result of an official policy of the City of Chicago. *See* 7th Cir. Pattern Instr. (Civil) 7.19; *see also Board of Cty. Comm'rs v. Brown*, 520 U.S. 397, 40 (1997) (stating that the plaintiff must prove that "the municipality was the moving force behind the injury alleged"). One of the methods by which a plaintiff can prove an official policy is by proof of "a widespread practice that was so permanent and well-settled as to constitute a custom or usage with the force of law, even though there was no express municipal policy or law authorizing the practice." *McCormick v. City of Chicago*, 230 F.3d 319, 323-24 (7th Cir. 2000); *see also* 7th Cir. Pattern Instr. (Civil) 7.20 (stating that an "official policy" means "[a] custom . . . that is persistent and widespread so that it is [the municipality's] standard operating procedure").

8. Here, Tomaskovic alleges that the City of Chicago had a widespread custom or practice of failing to adequately investigate and/or discipline its officers and/or of a police code of silence. *See* Dkt. 110, 4th Am. Compl. ¶¶ 111-12, 116, 127-28, 133, 146-47, 150, 159-60, 163. Mayor Emanuel's admission that such a custom or practice did in fact exist as far back as 2007, which is when the incident at issue in this case occurred, is therefore relevant evidence for Tomaskovic's *Monell* claim against the City.

*See* Fed. R. Evid. 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.").

9. More importantly, and leaving aside the evidentiary value of the admission itself (*see* Fed. R. Evid. 801(d)(2)), based on Mayor Emanuel's remarks it is apparent that he is in possession of information that is relevant to the *Monell* claim, and so Tomaskovic is entitled to obtain discovery regarding the factual basis for Emanuel's admission. *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case").

10. The depositions of chief executives are permissible regardless of whether they have personal involvement in a matter so long as they have relevant information. *See, e.g.*, *Johnson v. Jung*, 242 F.R.D. 481, 483 (N.D. Ill. 2007) (rejecting a motion for a protective order to bar a deposition of a chief executive, and noting that "[t]he test under Rule 26 is not whether a putative deponent had personal involvement in an event, or even whether she has 'direct' knowledge—which is merely another way of saying that she was a participant in the event—but whether the witness may have information from whatever source that is relevant to the claim or defense").

11. The standard is the same for the depositions of mayors and other government executives. For example, in *Northwestern University v. City of Evanston*, 2001 WL 743756, at *4 (N.D. Ill. June 29, 2001), the district court reversed an order by a

magistrate judge that quashed a deposition notice for the mayor of Evanston. In finding that the deposition of the mayor was proper, the court reiterated that the proper test is simply "that before a deposition can be taken, there must be a showing that some relevant information will come out of that deposition, so as not to waste any time." *Id.* Importantly for the purposes of the instant case, the court also noted that it was clear that the mayor had relevant information based on statements that the mayor had made in exercising a veto, which made a deposition not only necessary but proper. *See id.* at *2 ("What we, and likely the University, are curious about is the source of the animosity the mayor refers to in her veto statement, which can only be discovered through her deposition. . . . [T]he University really has no way of knowing what information the mayor possesses until it asks her."). The court also rejected the argument that the mayor's "busy schedule" precluded a deposition, stating that relevant Seventh Circuit precedent "does not stand for the proposition that no public official's deposition can be taken because he or she is otherwise too busy performing their duties." *Id.* at *4.

12. It is well settled that high-ranking government officials are not exempt from discovery. *See Clinton v. Jones*, 520 U.S. 681 (1997). Furthermore, bare representations that a witness does not know anything or is too important or too busy do not constitute exceptional circumstances to prohibit a deposition. *See CSC Holdings, Inc.*, 309 F.3d at 993; *see also New Medium Technologies LLC v. Barco N.V.*, 242 F.R.D. 460, 469 (N.D. Ill. 2007) ("Highly placed executives are not immune from discovery, and the fact that an executive has a busy schedule cannot shield him or her from being

10

deposed."). Moreover, courts have repeatedly held that the party seeking the deposition is entitled to test the defendant's statement that a witness does not know anything. *See, e.g., CSC Holdings, Inc.*, 309 F.3d at 993; *Six West Retail Acquisition v. Sony Theatre Management Corp.*, 203 F.R.D. 98, 102 (S.D.N.Y. 2001); *Johnson v. Jung*, 242 F.R.D. 481, 484 (N.D.Ill. 2007); *Balfour Beatty Rail, Inc. v. Vaccarello*, 2007 WL 842765, at *3 (M.D. Fla. 2007) (citing *Kuwait Airways Corp. v. American Security Bank, N.A.*, 1987 WL 11994, *2 (D.D.C. 1987) (citing *Amherst Leasing Corp. v. Emhart Corp.*, 65 F.R.D. 121, 122 (D. Conn. 1974) ("The reason why alleged lack of knowledge is not a sufficient ground to prevent a deposition is obvious. The very purpose of the deposition discovery is to test the extent of the deponent's knowledge and claims of ignorance.")).

13. Similarly to *Northwestern*, because the source and factual basis of Mayor Emanuel's knowledge regarding the Police Department's code of silence and culture of impunity related to excessive force claims is relevant to Tomaskovic's *Monell* claim, Mayor Emanuel is a proper deponent in this case.

14. Consequently, on January 25, 2016, Plaintiff's counsel served the City's counsel with a subpoena for the deposition of Rahm Emanuel. *See* Exhibit 3, Subpoena.

15. After Plaintiff's counsel inquired whether the City intended to comply with the subpoena, the City's counsel categorically refused to produce Mayor Emanuel.

16. Under Federal Rule of Civil Procedure 37(a): "On notice to other parties and all affected persons, a party may move for an order compelling disclosure or discovery. The motion must include a certification that the movant has in good faith

conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action." Similarly, Rule 37(d) provides that "[t]he court where the action is pending may, on motion, order sanctions if: (i) a party or a party's officer, director, or managing agent—or a person designated under Rule 30(b)(6) or 31(a)(4)—fails, after being served with proper notice, to appear for that person's deposition." Finally, Rule 45, which allows subpoenas for deposition testimony, permits enforcement via the Court's contempt power. *See* Fed. R. Civ. P. 45(a)(1)(B), (g).

17. Plaintiff's counsel has conferred via email with the City's counsel, Timothy P. Scahill, on two separate occasions before filing this motion. *See* Exhibit 4, Emails. Plaintiff's counsel has therefore complied with Rule 37's and Rule 45's good-faith-conferral requirements prior to bringing the matter to the Court's attention.

18. Because Mayor Emanuel is in possession of information relevant to Tomaskovic's *Monell* claim, and the City has refused to produce him for his deposition, Plaintiff moves for the Court to compel his deposition pursuant to Rules 37 and 45.

WHEREFORE, for the above stated reasons, Plaintiff Nicole Tomaskovic moves the Court to enter an order pursuant to Federal Rules of Civil Procedure 37 and 45 compelling Defendant City of Chicago to produce Rahm Emanuel for a deposition under oath, and for any other relief the Court deems just and equitable.

                Respectfully submitted,


                *s/Dana L. Kurtz*
                _____
                Attorney for Plaintiffs

Dana L. Kurtz, Esq.
Heidi Karr Sleper, Esq.
James G. Vanzant, Esq.
Kurtz Law Offices, Ltd.
32 Blaine Street
Hinsdale, Illinois 60521
Phone: 630.323.9444
E-mail: dkurtz@kurtzlaw.us
E-mail: hsleper@kurtzlaw.us
E-mail: jvanzant@kurtzlaw.us