# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

KELLY FUERY, DEBRA SCIORTINO, and )
NICOLE TOMASKOVIC, )
            )
           Plaintiffs, )
            )      No. 07 C 5428
       v. )
            )      Judge Sara L. Ellis
CITY OF CHICAGO, et al., )
            )
           Defendants. )

## OPINION AND ORDER

This case arises from an altercation on the Stevenson Expressway between Defendant William Szura, an off-duty Chicago police officer, and three women, Plaintiffs Kelly Fuery, Debra Sciortino, and Nicole Tomaskovic, who were returning home from the gay pride parade in Chicago, Illinois in June, 2007. Following the altercation, Plaintiffs sued Szura, the City of Chicago ("the City"), two Chicago police sergeants, and three state police officers seeking relief under 42 U.S.C. § 1983 and Illinois law for excessive force, false arrest, and malicious prosecution. A jury, after a trial in December 2015, found in favor of Defendants on all claims except for Tomaskovic's excessive force claim, and awarded Tomaskovic $260,000 in compensatory damages.

Now before the Court are the parties' post-trial motions. On February 3, 2016, the parties filed the first round of motions, including the City's motion [431] for judgment as a matter of law or relief from judgment pursuant to Federal Rules of Civil Procedure 50(b) and 60(b)(3), Defendant Szura's motion to join the City's motion [429], and Plaintiffs' Rule 59 motion for a new trial [432]. On February 24, Plaintiffs' trial counsel, Dana Kurtz, Heidi Sleper, and James Vanzant, filed motions to withdraw from the case and substitute Trent McCain as counsel for the

post-trial motions.  The Court granted the motions to substitute counsel on March 1.  On April 1, Plaintiffs and the state police defendants filed a stipulation [456] dismissing the Plaintiffs' post-trial motion for a new trial with respect to the state police defendants.  Finally, on April 8, the City filed a renewed motion for sanctions [461], which Szura moved to join [463].

Because the Court finds that Plaintiffs' trial counsel engaged in repeated misconduct throughout the trial and that Plaintiffs actively participated in the misconduct, the Court grants and denies in part the City's motion for sanctions.  The Court enters judgment in favor of the City and Szura on Tomaskovic's excessive force claim.  Additionally, even though Plaintiffs were not successful on any other claim, the Court also grants the City's motion for sanctions with respect to Fuery and Sciortino's claims because both of them participated in the misconduct at trial and are equally accountable for the misconduct of their attorney.  The Court denies the motion for sanctions with respect to the request for attorneys' fees, however, because the sanction of judgment is sufficiently severe to address the misconduct at trial.  Further, because Plaintiffs' claims were not frivolous, Defendants rightly bear the costs of defending against those claims.

The Court denies as moot the City's motion for judgment as a matter of law and relief from judgment as well as Plaintiffs' motion for a new trial.

**LEGAL STANDARD**

The City and Szura move for sanctions pursuant to Federal Rule of Civil Procedure 37, 28 U.S.C. § 1927, and the inherent powers of the Court to impose sanctions on a party that has abused the judicial process.  Each of these authorities has its own standard that should be applied when analyzing potential violations, and Rule 37 and §1927 are limited to specific types of conduct.  However, because the inherent authority of the Court is broader than both the rule and

the statute, and encompasses both, and the misconduct at trial was all part of a continuous course of conduct, the analysis below focuses solely on the standard associated with the inherent powers of the Court. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 49, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991) ("[T]he inherent power of a court can be invoked even if procedural rules exist which sanction the same conduct.").

The Court's inherent authority to rectify abuses to the judicial process authorizes sanctions for certain violations. *Dotson v. Bravo*, 321 F.3d 663, 667 (7th Cir. 2003) (citing *Chambers*, 501 U.S. at 49). Pursuant to its inherent authority, the Court may impose the sanction "of dismissal with prejudice (or its equivalent, judgment) if the circumstances so warrant." *Barnhill v. United States*, 11 F.3d 1360, 1367 (7th Cir. 1993). Determination of the appropriate sanction is left to the discretion of the district court. *Id.* In determining the appropriate sanctions to impose, "the district court should consider the egregiousness of the conduct in question in relation to all aspects of the judicial process." *Dotson*, 321 F.3d at 667 (citation omitted). Dismissal or entry of judgment on behalf of a party as a sanction is a severe measure and "should be employed sparingly and only when there is a record of delay, contumacious conduct, or when other, less drastic sanctions prove unavailing." *Id.* The Seventh Circuit, while not mandating any specific test, has suggested that when determining the appropriate sanction, a court should consider the following three factors: prejudice to the defendant, prejudice to the judicial system, and deterrence and punishment. *Schilling v. Walworth Cty. Park & Planning Comm'n*, 805 F.2d 272, 275 (7th Cir. 1986) (citing *Shea v. Donohoe Constr. Co.*, 795 F.2d 1071, 1074 (D.C. Cir. 1986)). The Court is not required to have considered the appropriateness of lesser sanctions if the circumstances justify imposition of the entry of judgment, but the Seventh Circuit has strongly counseled district courts to consider sanctions that are more targeted at the offending

attorney before instituting the severe sanction of dismissal or judgment. *Ball v. City of Chicago*, 2 F.3d 752, 758 (7th Cir. 1993). Additionally, the Court should make efforts to warn a party and its attorney that their conduct may subject them to sanction; however the Court is not obligated to issue such a warning, especially where the conduct is particularly egregious or the party or its attorney should have known that their conduct was inappropriate. *Id.* at 756.

Finally, the Court should also consider the relevant disciplinary history of the offending party when determining the sanction. *Rojas v. Town of Cicero, Ill.*, 775 F.3d 906, 909 (7th Cir. 2015). Where that history is clear that an individual has shown an "unwillingness to conform her conduct to requirements laid down by judicial orders or rules of procedure," the Court should impose a more firm sanction than the record of the case alone supports. *Id.*

## ANALYSIS

### I. Sanctions

The City and Szura move the Court to enter judgment in their favor as a sanction for the misconduct of Plaintiffs and their attorney at trial. The Court recognizes that overturning a jury verdict and entering judgment in favor of the non-prevailing party is the most severe sanction available in litigation and should not be imposed lightly. As the factual findings below demonstrate, the conduct at issue in this case and the prior history of the offending attorney clearly establish the appropriateness of judgment as a sanction in this case.

#### a. Factual Findings

The misconduct of Kurtz, Plaintiffs' counsel, at trial was pervasive and severe. While it is possible that each individual incident, standing alone, should rightly be given the benefit of the doubt and would not merit a severe sanction, the continuous, repetitive nature of the misconduct, the fact that Plaintiffs' counsel did not improve her conduct in the face of numerous warnings,

and Plaintiffs' counsel's history of censure support the Court's finding that her conduct at trial was willful, egregious, and not entitled to a presumption of unintentionality. Additionally, the Court finds that each Plaintiff directly engaged in various acts of misconduct at trial, further warranting sanctions. The Court identifies the acts of misconduct that form the bases of its findings below.

### i. *Improper Questions and Attempts to Elicit Improper Testimony*

On multiple occasions during trial, Plaintiffs' counsel asked questions that were intended to elicit testimony that was expressly barred prior to trial by the Court's rulings on the motions *in limine* ("MILs"). For example, during the direct examination of Sgt. O'Malley, Kurtz asked, "And as a sergeant, if you're responding to a call and you're advised that an officer pulled out his firearm, you're required to document that, correct?" Tr. 71:24–72:1. Defendants objected because this question was a clear attempt to elicit a response in violation of the Court's ruling on the City's first MIL, which barred evidence of the internal police investigation into Szura's actions.

Kurtz then asked O'Malley if she was upset about the decision of the judge in the Plaintiffs' criminal case. Tr. 81:24–25. This question improperly sought to elicit testimony from O'Malley regarding the criminal court judge's statements regarding the credibility of Szura and other police officers, references to which the Court barred by its ruling on the City's fourth MIL. At sidebar, Kurtz argued that she was not attempting to get into these statements through this line of questioning. Tr. 82:13–16. Kurtz argued that she was only attempting to ask O'Malley whether she was upset about the "decision in the criminal trial." Tr. 83:3–5. This is belied by the related deposition testimony, which did not explore the decision of acquittal but instead focused on the judge's statements regarding officer credibility. *See* Tr. 84:14–19. The Court

allowed Kurtz to question O'Malley about her reaction to the acquittal itself because that did not violate the MIL and did not allow her to ask about O'Malley's reaction to the judge's ruling regarding the credibility of the officers. Tr. 83:12–14.

On redirect examination of O'Malley, Kurtz again attempted to draw out testimony in violation of the MILs. Kurtz asked O'Malley, "Doesn't the Chicago Police Department have a rule or a requirement that Chicago Police Department supervisors, even in conjunction with the Illinois State Police, are required to investigate in certain situations?" Tr. 136:7–10. O'Malley responded that she is not aware of any such rule. Tr. 136:11. This question violated the Court's order on the City's first MIL by attempting to elicit testimony regarding any internal investigation of Szura. Defendants moved to strike this question at sidebar, however, the Court denied their request determining that striking the question would only draw the jury's attention to the impermissible question. Tr. 141:18–23.

Undeterred, Kurtz subsequently attempted to elicit testimony violating the same MIL by asking O'Malley, "You are aware as a supervisor that there are certain forms either you have to complete or you have to have the officer complete when there is -- in certain situations, correct?" Tr. 144:4–7. Defense counsel again objected and the Court sustained the objection. Tr. 144:8–9.

During Kurtz's direct examination of Szura she again attempted to elicit testimony barred by the City's first MIL. Specifically, she asked Szura, "What other forms did you fill out once you went back to the first district?" Tr. 201:21–22. Defendants objected and the Court sustained, instructing Kurtz again to ask the question in a way that did not violate the MILs. Tr. 201:23–25. Kurtz immediately followed this admonishment by asking another general question that likely would have elicited a response that would violate the MILs. Tr. 202:3. At this point, the Court directly intervened and asked Szura about the specific form, the Injured on Duty

("IOD") form, which the MILs did not prohibit.  Tr. 202:7–18.  At a subsequent sidebar, Kurtz stated that she thought that the City did not have an objection to her referring to the IOD or Tactical Response Report ("TRR").  Tr. 208:4–8.  The Court reiterated to Kurtz that the Court would not permit reference to the TRR and that she should, at this point, have been familiar with the Court's rulings.  Furthermore, the Court made clear to Kurtz that when she generally referred to "forms" in her questions, this could violate the MILs because there were some forms which the Court excluded and the Defendants did not know about which forms she was asking when she simply said "forms."  Tr. 208:9–12.  The Court also advised Kurtz against any further "dancing around or near or by the rulings on the motions in limine."  Tr. 207:23–208:1. Unfortunately, the admonition did not deter Kurtz from further violations of the MILs.

Kurtz also repeatedly asked Szura about the content of various 9-1-1 calls before the Court had ruled on their admissibility and without laying a proper foundation.  Tr. 161:1–2; 164:24–25; 167:10.  After the Court excused the jury for lunch, the Court began to remind Kurtz that it had not yet admitted the 9-1-1 calls and Kurtz interjected, "I'm sorry, Your Honor.  I completely -- no excuse, but I forgot you were going to review the 911, and I apologize.  So I'll put that in my outline.  I'm so sorry.  I apologize."  Tr. 176:9–12.  This excuse is simply not credible.  Minutes before the examination of Szura, the attorneys discussed this very issue with the Court.  The Court stated that it had not ruled on the admissibility of the tapes because it had not received copies yet and requested Kurtz to provide copies.  Kurtz stated she would send them via email, and the Court stated that it would review the tapes during the lunch break and issue a ruling that afternoon.  Tr. 99:8–100:18.  Despite this conversation, Kurtz claimed she forgot that the Court had not ruled on the tapes' admissibility less than two hours later.

During the direct examination of her own clients, Kurtz asked questions which were clear attempts to elicit improper testimony. Kurtz asked Fuery, "Was anyone given a field sobriety or breathalyzer on the scene that you saw?" Tr. 499:3–4. This question touched directly on an MIL and was clearly improper: the Court expressly barred any evidence related to the failure to perform a field sobriety test or breathalyzer on Szura. Following an objection by Defendants, Kurtz immediately withdrew the question and asked a proper version of the question to Fuery: "Were you ever given a breathalyzer or a field sobriety test," demonstrating she was aware of the proper way to ask this question all along. Tr. 499:9–10.

In the response to the motion for sanctions, Plaintiffs' new counsel argues "the record is clear that Plaintiffs' prior counsel was questioning *Fuery* about whether *Plaintiffs* were given breathalyzer examinations." Doc. 480 at 13. This assertion is an astonishing attempt to mischaracterize the record. The immediately preceding line of questioning was as follows:

> Q. And who spoke first, [Trooper Weyforth] or you?
> A. I told him. I said the same thing. I said [Szura had] been drinking. He was beating us up on the highway. Then he said that was impossible, that he was working all day.
> Q. Did anyone suggest or ask you if you had been drinking?
> A. I don't -- no.
> Q. Was anyone given a field sobriety or a breathalyzer on the scene that you saw?

Tr. 498:20–499:4. It is by no means "clear" that Kurtz was limiting her question to whether Plaintiffs were given breathalyzer tests. Quite the contrary, Szura is the only person who is alleged to have been drinking during this line of questioning. The direct implication is that he is the one who should have been given the field sobriety or breathalyzer test.

Kurtz also engaged in improper lines of questioning intended to garner sympathy from the jury. She asked Fuery why she was not able to pay off her entire legal bill for her criminal case, to which Fuery responded "I couldn't come up with the whole amount." Tr. 515:2. She

asked Tomaskovic "In June 2007 did you have insurance?" Tr. 935:9. Both of these questions are improper and not relevant. *See Rojas v. Town of Cicero*, No. 08 C 5913, 2011 WL 6753992, at *3 (N.D. Ill. Dec. 22, 2011) (irrelevant statements about plaintiff's financial status are improper attempt to garner sympathy). Defendants appropriately objected at the time and the Court sustained the objections. Tr. 515:3–7; 935:10–14. Kurtz had already rung the bell, however, with those questions.

Continuing with her improper tactics, during the examination of Trooper DeAvila, Kurtz directed DeAvila's attention to the first page of an exhibit and stated "If you look at the first page, on the bottom it says 'IPRA 0007.' Do you see that?" Tr. 1125:14–15. This question violated the MIL regarding references to the Independent Police Review Authority ("IPRA") investigation.[1] At sidebar Kurtz stated that she made this statement inadvertently. Tr. 1128:1–4. The City's counsel stated that Kurtz led him to believe she would conduct the examination using the City's exhibit binder which includes the same reports, with the IPRA marking removed. Tr. 1128:10–15. Kurtz replied that she did not use the City's binder because the reports she intended to use were in three separate locations, whereas Plaintiffs' binder had them all together as one exhibit. Tr. 1128:16–22. Whatever efficiency she sought to gain was clearly outweighed by the need to conduct another sidebar to address the violation of a MIL her question created. The Court finds that Kurtz's improper question was not inadvertent but the result of her continued, deliberate efforts to obtain an advantage with the jury by playing fast and loose with procedure and the Court's orders.

---

[1]     The acronym IPRA is well-known in the greater Chicago area as the body that investigates police misconduct. There is a high-profile public debate surrounding IPRA's efficacy in rooting out police misconduct and the local media frequently discusses the many issues surrounding IPRA. It is highly likely, therefore, that the jury understood that these documents were related to such an investigation.

With the next witness, Trooper Argones, Kurtz again attempted to elicit testimony in violation of the MIL regarding the investigation. She asked, "And would you agree that Officer Szura as an involved party should have been subject to the same type of examination as the girls?" Tr. 1196:1–3. Following a sustained objection, Kurtz moved on from this line of questioning and did not return, apparently satisfied that she had sufficiently made her point to the jury that there was some sort of cover-up or conspiracy. Tr. 1196:4–10.

Kurtz also asked several questions that included impermissible hearsay in the question itself or questions designed to elicit hearsay responses. *See e.g.*, Tr. 164:24–25 ("Did you hear the [9-1-1 call] that indicated officer had his gun drawn on two subjects?"); Tr. 167:10–13 ("Q. And you've listened to the 911 calls, right? A. Yes, ma'am. Q. And you never heard anybody indicating -- MR. SCAHILL: Objection, foundation, hearsay."); Tr. 499:12–13 ("And when Senior Master Sergeant Weyforth spoke to you, do you recall anything else that he said to you?"); Tr. 747:7–9 ("Q. And what happened before this picture? A. I actually didn't know it was bleeding, and somebody told me that I had blood –"); Tr. 760:7–8 ("Q. So did somebody tell you about how long you would be in the cell?"). These are but a few examples of Kurtz's use of this improper tactic.

ii.     *Failure to Properly Prepare Witnesses or Misconduct by Witnesses*

Two of the three Plaintiffs as well as Plaintiffs' expert, Joseph Stine, made statements that violated an MIL. Plaintiffs' counsel stated that they prepared all of the witnesses, including advising the witnesses of what they were not allowed to say during their testimony. Tr. 941:1–6; 943:1–13; 1521:13–18. Despite the alleged thorough preparation of these witnesses, all of them violated at least one MIL during their testimony.

During the testimony of Plaintiff Sciortino, Kurtz asked Sciortino about the time she spent in the jail cell. Sciortino, unprompted, offered that she had never been arrested or convicted before, which violated the MILs. Tr. 760:1–3. While Kurtz did not directly solicit this testimony, it was indicative of her failure to appropriately inform her clients and witnesses about the limitations on their testimony.

More concerning are the actions of Tomaskovic, who twice offered testimony in violation of the MILs—regarding her medical diagnosis, Tr. 932:3–6, and her desire to press charges against Szura, Tr. 918:24–25. When questioned by the Court regarding whether her attorney instructed her regarding what she was not permitted to say during her testimony, she first stated that her attorney did not inform her of any such limitations. The Court had the following exchange with Tomaskovic:

> THE COURT: So some things come into evidence, and then some things I've ruled based on the law can't come in. And so what I'm asking you is did your attorneys go over those things with you?
> THE WITNESS: No, not specifically.
> THE COURT: Okay.
> THE WITNESS: That I can recall. I don't remember going over and saying you can't say that I want to press charges.
> THE COURT: Okay. Was that ever told to you?
> THE WITNESS: What?
> THE COURT: Were you ever instructed by your lawyer that you weren't allowed to say that?
> THE WITNESS: No.

Tr. 938:18–939:6. At this point the Court excused Tomaskovic from the courtroom and admonished Kurtz again regarding her improper questioning and general disregard of proper procedure. Tr. 941:14–942:25. Following a brief discussion of other issues, the Court adjourned for the weekend and Kurtz left the courtroom. A few minutes later, Tomaskovic reentered the courtroom and requested to address the Court. Tr. 946:3–5. Back on the record, Tomaskovic stated that she did not understand the questions the Court asked her regarding the MILs. Tr.

946:10–19.  She stated that no one spoke to her about her testimony after the Court excused her from the courtroom, but that Kurtz did in fact previously tell her there were certain things she could not talk about during her testimony despite her recent statement to the contrary.  Tr. 946:23; 947:1–3; 950:2–5.  When asked what these limitations were she stated, "There were stipulations in this that we were not allowed to speak of, and I believe one of them was about pressing charges, and the other one was about something about doctors, doctor diagnoses or something like that.  I know there was a few others."[2]  Tr. 950:8–12.  The Court finds it ludicrous that after answering clear direct questions in the negative, Tomaskovic independently remembered that she did in fact receive preparation from her attorney and independently decided to go back into the courtroom to inform the Court of her error.  Instead, it is much more likely that Kurtz, who immediately left the courtroom after the Court adjourned for the day, or someone working for Kurtz told Tomaskovic that her answers could lead to a mistrial and that she needed to correct this with the Court – by lying about her level of preparation.  The other possible, though no less improper, explanation is that Kurtz did properly prepare Tomaskovic, yet Tomaskovic decided to ignore that preparation, deliberately offered improper testimony, and only recanted when she realized the potential for adverse consequences, including a mistrial.  In either scenario, Tomaskovic acted abusively toward the judicial process.

Additionally, after Tomaskovic addressed the Court, Fuery and Sciortino asked to address the Court regarding the same topic.  Tr. 952:2–953:9.  Both Fuery and Sciortino stated that Kurtz instructed them regarding the MILs prior to trial.  *Id*.  The Court finds it unlikely that Fuery and Sciortino would have decided to come back into the courtroom to address the Court regarding this topic on their own initiative. This further supports the finding the Kurtz instructed

---

[2]      Not surprisingly, these two topics are the very two topics about which Tomaskovic improperly testified.

her clients, including Tomaskovic, to go back into the courtroom and tell the Court they had been prepared on the MILs.

The third instance of such improper testimony came from by Plaintiffs' expert, Stine. The Court clearly ordered that Stine could not testify as to "whether Defendant Szura was acting as an officer or as a private citizen." Doc. 387 at 14. Despite this unambiguous ruling, when Sleper asked Stine, "Why is it important to announce that you are a police officer," Tr. 1519:21–22, Stine responded, "[W]hen [Szura] gets out of his car and starts walking back, he says he wants to find out what's going on. He's conducting an investigation. He's acting as a police officer . . . ." Tr. 1519:23–25. Defendants objected to this statement on the basis that it violated a MIL, and the Court held a discussion at sidebar. Tr. 1520:2–8. At the sidebar Sleper, co-counsel for Plaintiffs, stated that they did prepare the witness on the MILs. Tr. 1521:13–18. Given the failure of multiple witnesses to comply with the MILs, this defense carries no weight because it is plain to the Court that Plaintiffs' counsel placed very little importance on ensuring their witnesses actually complied and likely believed that any violations would at worst be stricken, but that the jury would have already heard the offending comment and the bell cannot be unrung. This tactic is extremely prejudicial to Defendants, unethical, and in this Court's opinion, it is exactly what happened in this case.

iii.     *Communications with the Media*

Following the first day of trial the *Chicago Tribune* published an article, written by reporter Jason Meisner, about this case on their website and in print. The Court independently became aware of this article while reading the front page of the *Chicago Tribune's* website that evening, December 8th. The article included links to audio files and transcripts of 9-1-1 calls that the Court had not admitted into evidence. The article also included still shots from a "day-

in-the-life" video of Tomaskovic showing her physical condition around the time of her back surgery. The Court, concerned that these documents were provided to the *Tribune* reporter in an attempt to improperly influence the jury and to interfere with the ability of Defendants to present their case, questioned the attorneys regarding how the reporter came to possess the materials. Kurtz stated to the Court that she did not know how the reporter got the documents and that "They contacted me before the trial. I specifically declined and said: I do not want press coverage and, no, you cannot interview my clients. Mr. Meisner was downstairs yesterday. I specifically said: No comment. I do not know where they got the videos or the day in the life picture." Tr. 288:2–8. Kurtz also stated, "Your Honor, I will swear to you I did not send [the photograph] to him. I will confer with my clients, but I can also assure you that they did not either. The press has been covering this case for a long time." Tr. 289:9–12. The Court then inquired individually of each defense attorney whether they or their clients provided the materials to the press; each attorney denied doing so. Jessica Scheller, attorney for the state police defendants, also stated that the state police did not release anything to the media and that they had received no Freedom of Information Act requests related to the audio or transcripts. Tr. 289:13–291:6.

Timothy Scahill, attorney for the City, stated that he informed Kurtz of the article when he arrived in the courtroom around 8:50 a.m. on December 9th. He stated that Kurtz denied sending the materials to the *Tribune* and that she then exited the courtroom and returned a few minutes later. When she returned she told Scahill that she did not see any transcripts linked to the article. Scahill noted to the Court that the article was modified at 8:58 a.m.,[3] the same window of time Kurtz was out of the courtroom. Tr. 291:7–23.

---

[3] The *Tribune* website still indicates that the last modification to the article was at 8:58 a.m. on December 9, 2015. http://www.chicagotribune.com/ct-william-szura-911-calls-20151208-htmlstory.html.

Before breaking for lunch, Kurtz again stated to the Court that she did not provide the photos to the press, stating, "I did not give it to him, Your Honor, and I will swear on that. I did not give it to him." Tr. 307:16–17. The Court then asked if she provided the press with the "day-in-the-life" photo in 2013. Kurtz stated, "I don't think so. . . I would have to check, and I can certainly do that for Your Honor." Tr. 308:4, 7–8. Following the lunch break, Kurtz informed the Court that she did in fact send Meisner the photo from the "day-in-the-life" video in December, 2013 but continued to deny sending him the 9-1-1 call transcript. Tr. 312:17–25. Kurtz then changed her story regarding her interaction with Meisner the prior day, stating that, "So and then last night Mr. Meisner was downstairs, and I told him that things were excluded from the case and they cannot be -- they're not in the trial." Tr. 316:7–10. When asked about this inconsistency with her prior statement she stated, "I actually didn't remember. Ms. Sleper said that I -- I just remembered that I said no comment to him. So I actually did not remember telling him that. And Ms. Sleper was there, and she said that that's what she remembered me saying to him. But I did tell him that things were excluded." Tr. 317:24–318:4. The Court simply does not find this explanation credible.

During the same lunch break, defense counsel was able to locate, via a Google search, an electronically cached copy of the transcript attached to the article and presented this information to the Court. Tr. 313:1–5. The image of the transcript included the marking "Plaintiffs' Exhibit 4" and appeared to be identical to the documents included as exhibits to the final pretrial order. Doc 389-2. Prior to trial, the Parties never publicly filed this version of the transcript and it was only in the possession of parties to whom Plaintiffs sent it. And while there was a version of this transcript that was attached to a publicly filed document, that version did not include the

"Plaintiffs' Exhibit 4" marking. This indicates that only a party could have provided the transcript to Meisner.

The Court consulted with the Clerk's office and determined that the Clerk's office was not in possession of the audio files and that no one had attempted to access the publicly filed version of the transcripts, indicating that the media did not independently obtain either of these items. Tr. 286:7–12.

Finally, the Court conducted individual interviews with each juror to determine if any had read the *Tribune* article and if so, whether that juror could remain impartial. One juror stated that his wife told him about the article but he did not read it. Tr. 321:2–6. Other jurors stated that one of the jurors came into the jury room in the morning and told them that the article was on the front page of the *Tribune*. *See, e.g.*, Tr. 323:18–20. After interviewing all of the jurors and determining that none had read the article, the Court determined that there was no prejudice to Defendants based on the publication. Tr. 354:18–21.

The Court was not able to conclusively determine how the transcript and audio recording came into the possession of the *Tribune*. However, in the light of the fact that the dissemination of these materials to the press would only benefit Plaintiffs and the general lack of respect and candor displayed by Plaintiffs' counsel throughout the trial, in addition to Kurtz's shifting recollection of events, the Court determines that the most likely scenario is that Kurtz or someone working at her direction provided the materials to Meisner. The Court also cannot ignore the suspicious timing of the edit to the *Tribune* article removing the link to the transcript and finds it likely that the edit occurred in response to a request from Kurtz to a contact at the *Tribune*. However, the Court finds that regardless of how the materials were provided to the media, the most egregious violation in this instance was Kurtz's dishonesty to the Court in

response to its investigation of this issue. While Defendants were not prejudiced by the content of the article, the distraction to the proceedings the publication caused did interfere with their ability to prepare and present their case and it wasted substantial resources of the Court.

    *iv.*    *Destruction of Notes*

During the cross-examination of Fuery, James Thompson, Szura's attorney, asked Fuery about a set of notes she wrote about the incident the morning after it occurred. Tr. 589:12–13. Fuery confirmed that she did write a set of notes the day after the incident. Tr. 589:14, 16. She testified that Kurtz was the first attorney with whom she met after the incident and that meeting took place within a few days. Fuery stated that she took the notes to that meeting with Kurtz and "gave them to her." Tr. 589:17. Thompson expressed surprise at this statement. Prior to this testimony, the Defendants had been under the impression that Fuery had thrown the notes out after meeting with Kurtz consistent with her deposition testimony. In an attempt to clarify, Thompson asked Fuery, "You gave them to Ms. Kurtz?" Tr. 589:19–20. Fuery responded, "Yes." Tr. 589:21. Thompson then asked, "And when you left Ms. Kurtz's office, she still had possession of those notes?" Tr. 589:22–23. Fuery responded, "I didn't need the notes anymore. I told her everything that was going on and everything that was in the notes, yes." Tr. 589:24–25. The Court then asked, "When you left her office, she had possession of the notes, is that right?" Tr. 590:7–8. Fuery responded, "Yes." Tr. 590:9. The Court excused the jury and held a hearing on the issue.

During the hearing, Kurtz first directed the Court to Fuery's deposition transcript in which she was asked if she threw the notes away, to which Fuery responded in the affirmative. Kurtz then stated that before the meeting with Fuery she "directed them to take notes of the incident for me. So that was before the meeting, and [Thompson] did not ask, you know,

whether she had a conversation with an attorney that directed her to make those notes. Those would be privileged, so I would object to this whole line of questioning on the basis of privilege." Tr. 593:12–17. At this point Scahill, attorney for the City, interjected that the prior page of the deposition contradicts Kurtz's claim of privilege in stating that Fuery drafted the notes at the suggestion of Trooper DeAvila. Kurtz responded that "I believe I had a conversation with them the day they got out of jail. I mean, this is 2007. I'll have to go back and check my notes." Tr. 594:22–24.

The Court then called Fuery back into the courtroom and questioned her regarding the notes. Fuery stated that she created the notes at the suggestion of Trooper DeAvila, that she was not instructed by Kurtz to create any notes, and that she met with Kurtz within a few days after the incident. Tr. 599:11–600:9. The Court then excused Fuery again. At this point Kurtz stated that the only set of notes she had were those that she directed Fuery to write. She stated that she spoke to Sciortino the morning after the incident and instructed her to have each of them take notes of what happened. Tr. 601:16–25. Kurtz then insisted that she was not aware of any document request for notes. Tr. 604:9–11. At that point, the Court instructed Defendants to locate the document request and the response and adjourned the trial until the afternoon. Tr. 604:19–21.

During the afternoon session, Defendants provided the document requests and responses. The Court determined that Fuery's notes were responsive to several of the requests. Tr. 607:12–609:5. At this point Kurtz stated that she had reviewed her records and determined that she instructed Plaintiffs to create a different set of notes several months after the incident, rather than days later as she had stated during the morning. Tr. 609:10–19. Kurtz also stated that she did not meet with Plaintiffs in the days immediately following the incident, but her paralegal did and

she speculated that they also met with a criminal attorney during that period. Tr. 609:20–611:20 Kurtz stated that she did not receive the notes and that the Fuery threw them away. Tr.611:22–612:1. She also stated that Fuery testified in her deposition "that she threw them away, she did not bring them to [Kurtz's] office," Tr. 616:21–22, mischaracterizing Fuery's testimony—Fuery never said that she did not bring them to Kurtz's office; in fact she said the opposite on the stand. Tr. 589:13–14.

Fuery then retook the stand and was questioned again about the notes in the presence of the jury. Thompson first asked her whether she had spoken to anyone about her testimony during the recess. Tr. 623:16–17. She stated that she had not. Tr. 623:18. He then asked her again what she did with the notes to which Fuery replied "I threw them out." Tr. 625:21. This testimony is consistent with her deposition testimony but contradicts what she had testified to earlier at trial. The Court finds it entirely possible that she would not remember exactly what she did with the notes after eight years, but finds the reversal of her testimony at trial to be highly suspicious and likely the result of improper coaching by Kurtz or someone working for her attorney during the recess.

Defense counsel next asked Fuery again about which lawyer with whom she met a few days after the incident. Fuery stated that it was not the criminal defense lawyer. Tr. 606:13–19. This again contradicts Kurtz's assertion from earlier that day that Fuery never brought the notes to her office and that she perhaps brought them to the criminal attorney's office.

The Court need not determine which set of facts is the truth. Whether Fuery gave the notes to Kurtz as she testified at trial, or threw them out after meeting with Kurtz or some other attorney as she stated during her deposition, the notes were not available to Defendants, and this prejudiced them. Furthermore, Kurtz's behavior when addressing this issue during trial was just

another example of her staking out the most favorable position to herself and only backing down, incrementally, when presented with facts that contradicted her preferred narrative. First she argued that the notes were privileged and created at her instruction in advance of her meeting with Plaintiffs in the days following the incident, next she argued that she really meant a different set of notes, and finally she argued that she did not meet with Plaintiffs for many months after the incident. Not only are these shifting explanations unfair to Defendants and deceptive to the Court, they caused the Court and Defendants to waste a great deal of time attempting to sort out the truth.

Ultimately, the Court decided to give the jury a spoliation instruction, informing them that they may assume that Fuery's notes would have been unfavorable to her if, "one, plaintiffs intentionally destroyed the evidence; and, two, plaintiffs destroyed the evidence in bad faith." Tr. 1652:11–13. Whatever effect this instruction had on the jury, it did not serve as an adequate sanction for Kurtz's shifting, misleading statements and the inconsistency of Fuery's account. The bad faith exhibited by Kurtz and Fuery in response to the inquiry at trial merits additional sanctions on top of the spoliation instruction. *See Domanus v. Lewicki*, 742 F.3d 290, 299 (7th Cir. 2014) (spoliation instruction "insufficiently harsh" where party provided inconsistent explanations regarding the availability of requested discovery materials and ultimately did not provide them).

> v. *Other Misrepresentations to the Court*

Plaintiffs' counsel made several other misrepresentations to the Court throughout the trial, including misstating Federal Rule of Evidence 902(11) and misstating the Court's ruling on the MIL regarding Sciortino's shirt. While neither of these instances occurred in front of the

jury, they both tend to show the general lack of candor and respect for the judicial process that permeated Plaintiffs' counsel's behavior throughout the trial.

In their response to the motion for sanctions, Plaintiffs argue that their attorney did not willfully misrepresent Rule 902(11), but was relying upon an out of date application on her iPhone that "had not updated to the 2015 version of the rule." Doc. 480 at 12; Tr. 474:3–8; Tr. 481:17–482:12. This is a bizarre defense given the fact that Rule 902 has not been modified since December 2011. Plaintiffs would like this Court to believe that their attorney, who appears regularly in federal court, has done so, for at least four years, without consulting the most current version of the rules of evidence. This is either not truthful or a striking admission of professional incompetence.

Plaintiffs do not even address the misrepresentation of the MIL ruling in their response, but merely attempt to redirect the Court to Kurtz's second argument, that she was renewing her request that the Court bar the t-shirt. Tr. 837:3–838:8. While it is true that a party may renew such a request at trial, Kurtz did not actually make such a motion until her attempt to convince the Court that it had reserved ruling on the MIL failed. This, like many of the other missteps by Kurtz, could on its own be interpreted as an honest mistake; however, in light of everything that had occurred up to this point at trial, the Court finds that it was a dishonest attempt to obtain an advantage in raising her objection. At best it shows a lack of familiarity with the Court's rulings, which on the fourth day of trial where the Court had already admonished Kurtz numerous times regarding the motions, and is hardly a better explanation.

The above findings are not a comprehensive account of all instances of Plaintiffs' and Plaintiffs' counsel's misconduct at trial, but clearly reflect a persistent course of conduct that was not modified in the face of escalating admonishments and sanctions from the Court. The Court

also was not able to completely investigate every misrepresentation or violation of the rules during trial as this would have detracted even further from the central objective of the trial and further prejudiced Defendants. However, based on the conduct the Court observed and the numerous conflicting statements by Plaintiffs' counsel, the Court finds that Kurtz acted in bad faith in trying this case.

### b. Conclusions of Law

The continuous, contumacious course of conduct pursued by Kurtz, and on several occasions aided by each of her clients and her co-counsel, rises to the level of severity where a sanction of judgment for the City and Szura is appropriate. The record establishes numerous instances of misconduct that prejudiced Defendants in fairly presenting their case. Kurtz, her clients, and the expert witness made numerous inappropriate statements in front of the jury that prejudiced Defendants.

The misconduct of Kurtz and Plaintiffs forced Defendants and the Court to waste substantial amounts of time throughout the trial instead of focusing on the merits of the case. Each Defendant had to respond to the Court's inquiries regarding whether they had provided the 9-1-1 tapes or transcripts to the media, the City took time during a recess to locate its document request from discovery to show the Court that they had in fact requested Plaintiffs' notes because Kurtz denied receiving such a request, and the parties spent a substantial amount of time at sidebars discussing violations of the MILs by Kurtz. All of this activity was a considerable distraction from the merits of the case and unfairly inhibited Defendants from using that time to prepare to examine witnesses or otherwise prepare for the regular trial proceedings. And all of these distractions were the result of intentional, improper actions on the part of Kurtz and Plaintiffs. The destruction of Fuery's notes additionally prejudiced Defendants. These notes,

taken less than a day after the incident in question, are highly relevant to the case and Defendants were deprived of the ability to make use of them either by the failure of Kurtz's office to retain and produce them or the destruction of them by Fuery. Either way, Kurtz and her firm had a responsibility to maintain the notes when they became aware of them, and yet they failed to do so to Defendants' detriment. *See MacNeil Auto. Prods., Ltd. v. Cannon Auto. Ltd.*, 715 F. Supp. 2d 786, 800 (N.D. Ill. 2010) ("A party has a duty to preserve evidence over which it had control and reasonably knew or could reasonably foresee was material to a potential legal action." (citations omitted)).

Although Kurtz's and Plaintiffs' actions clearly prejudiced Defendants, the Court may still impose sanctions even where there is no prejudice but the actions of the party "exhibit such flagrant contempt for the court and its processes that to allow the offending party to continue to invoke the judicial mechanism for its own benefit would raise concerns about the integrity and credibility of the civil justice system that transcend the interests of the parties immediately before the court." *Barnhill*, 11 F.3d at 1368. The Court may impose sanctions pursuant to its inherent authority where the party has "willfully abused the judicial process or otherwise conducted litigation in bad faith." *Tucker v. Williams*, 682 F.3d 654, 662 (7th Cir. 2012) (collecting cases). Clumsy lawyering alone is not sufficient to warrant sanction; the Court is required to make a finding of actual bad faith, willfulness, or fault to support sanctions under its inherent authority. *See id.*; *Greviskes v. Univs. Research Ass'n, Inc.*, 417 F.3d 752, 759 (7th Cir. 2005) ("Dismissal is appropriate where a party has displayed fault, bad faith, or willfulness."). This is precisely the situation presently before the Court.

The offending conduct of Kurtz throughout the trial demonstrated a clear contempt for the rules of procedure and the rulings of this Court. Rather than abide by rules with which she

disagreed and take up those rulings on appeal as necessary, Kurtz chose simply to ignore them whenever convenient to her case. Kurtz and Plaintiffs exhibited a consistent lack of candor with the Court, most notably in regards to the communications with the media, witness preparation regarding the MILs, and the creation and preservation of Fuery's notes. In each of these instances Kurtz subjected the Court to ever shifting, contradictory explanations, consistent only in their purpose to aid Kurtz at the cost of the truth. Because of the repeated, frequent nature of these violations in the face of repeated admonishments, the Court cannot simply chalk them up to "clumsy" lawyering, but finds that Kurtz acted willfully and in bad faith throughout the trial.

This conclusion, while amply supported by the record in this case alone, is further justified in light of the Kurtz's substantial disciplinary history in the courts. As detailed in *Rojas*, she has been sanctioned numerous times by the courts and has shown no indication of modifying her behavior to avoid future sanction. *See Rojas*, 775 F.3d at 909. Kurtz's misconduct in *Rojas* itself is so similar to much of the misconduct here that a brief summary is instructive. After a trial before Judge Holderman, the defendants in *Rojas* moved for a new trial pursuant to Rule 59(a), arguing that Kurtz engaged in misconduct which prejudiced their case. *Rojas*, 2011 WL 6753992, at *3. In granting the motion for a new trial, Judge Holderman found that Kurtz "engaged in a repeated pattern of misconduct, starting with inappropriate comments in her opening statement and repeated attempts to introduce inadmissible and prejudicial evidence before the jury that, taken together, prejudiced the defendants' case on the political retaliation claim." *Id*. In an instance remarkably similar to Kurtz's conduct in the present matter, the *Rojas* court found that "despite a dispute over the admissibility of testimony about Dominick lying on an employment application, Kurtz questioned Dominick on the topic in front of the jury before bringing the issue up in a sidebar." *Id*. This is nearly identical to Kurtz's tactics regarding the 9-

1-1 calls; she repeatedly asked Szura about the content of various 9-1-1 calls while fully aware that the Court had not yet ruled on their admissibility. Judge Holderman's opinion lists numerous other infractions that this Court could almost copy and paste into this order simply with changing the names of the parties.

The similarity of Kurtz's behavior in *Rojas* to her behavior in the present case clearly demonstrates that she has made no effort to change her ways and that lesser sanctions have proved unavailing. For this reason, even if a lesser sanction were sufficient to remedy her misconduct in the case at bar, entry of judgment would still be appropriate in order to send a clear message to Kurtz that she may not continue to practice law in this manner in the Northern District of Illinois and expect to obtain a judgment for her clients despite her behavior (or perhaps because of it).

Despite all of the misconduct at trial and Kurtz's prior history, Plaintiffs' counsel contends that a sanction of judgment for the City and Szura is inappropriate because it would punish Plaintiffs for the actions of their attorney. In support of this argument Plaintiffs claim that judgment in favor of the City and Szura would not be proportionate to the misconduct alleged. They state, incorrectly, that there is no claim of misconduct by Tomaskovic in the motion and that the entire motion focuses solely on misconduct of Kurtz and in small part Fuery.

First, the Defendants do allege misconduct by Tomaskovic. In violation of the MILs, Tomaskovic stated during her testimony that she wanted to press charges against Szura. Tr. 918:24–25. She then told the Court that she was given no instructions about limitations on her testimony by her attorneys. Tr. 938:18–939:6. Then, after being excused, Tomaskovic returned to the courtroom and told the Court that her attorney did in fact tell her that she could not talk about wanting to press charges but that she misunderstood the Court's questions about whether

she had been prepared by Kurtz to testify.  Tr. 946:10–19.  She also stated that no one told her to come back into the courtroom to make that statement.  Tr. 946:20–23.  The Court finds that Tomaskovic engaged in misconduct regardless of which version of her story is correct.  Either she willfully disobeyed the Court's MILs or she lied to the Court about being prepared by her attorney.  The Court finds that the second explanation is more likely accurate, and that it is a far more egregious violation, as dishonesty to the Court alone is sufficient to merit dismissal of a claim.  *See, e.g.*, *Jackson v. Murphy*, 468 F. App'x 616, 620 (7th Cir. 2012).

Furthermore, Defendants do not only seek judgment on Tomaskovic's claims, but on all Plaintiffs' claims.  Even though the jury returned verdicts in Defendants' favor on all of Fuery and Sciortino's claims, Fuery and Sciortino have filed a motion for a new trial on their claims, therefore the sanctions are not moot.  Even though Plaintiffs do not address the misconduct of Sciortino and Fuery in their opposition to the motion for sanctions, the Court finds that Defendants have alleged misconduct by each of them and that these allegations are supported by the record.

Fuery and Sciortino both claim to have independently come into the courtroom to tell the Court that they were instructed on the MILs before testifying.  The Court finds that they did this at the direction of their attorney.  Fuery also gave contradictory testimony regarding the destruction of her handwritten notes during trial, again indicating that she engaged in impermissible discussions with her attorney during trial.  Tr. 589:17–590:9, 625:21.  Additionally, Sciortino, despite claiming to have been advised of the MILs, offered testimony about her lack of a criminal history that violated the MILs.  Tr. 760:1–3.

However, even if Plaintiffs themselves engaged in no misconduct, judgment for Defendants would still be appropriate in this case.  A court may enter judgment as a sanction

even where there is no misconduct by a party, only by her attorney.  *See Ball v. City of Chicago*, 2 F.3d 752, 757 (7th Cir. 1993) (affirming sanction of dismissal where misconduct committed solely by the attorney and the party was blameless).  Further, parties are bound by the actions of their attorney, particularly where they have freely chosen that counsel, like Plaintiffs have done here.  *See Pyramid Energy, Ltd. v. Heyl & Patterson, Inc.*, 869 F.2d 1058, 1061–62 (7th Cir. 1989).  Such action should not be taken lightly, but in this case, where there is a substantial record of misconduct by Kurtz and her long history of engaging in misconduct in federal litigation, the Court finds that plaintiff misconduct is not required to support a sanction of judgment for Defendants.

Plaintiffs also argue that because Plaintiffs' trial counsel, Kurtz, is no longer representing them in this case, they cannot fully respond and Kurtz is entitled to "fair notice and an opportunity to respond before sanctions could be assessed against her."  Doc. 480 at 3.  It is true that the Court cannot impose sanctions without notice and the opportunity to be heard.  *Knorr Brake Corp. v. Harbil, Inc.*, 738 F.2d 223, 227 (7th Cir. 1984).  In this case both the Plaintiffs and Kurtz have been provided adequate notice and the substitution of counsel is irrelevant.  First, the City initially filed the motion for sanctions during trial while Kurtz was still representing Plaintiffs.  The Court denied that motion at the time; however, the Court noted that it would address the misconduct at the end of the trial.  Tr. 957:21–23.  Therefore, Kurtz was on notice that as part of the post-trial motions the Court would be reconsidering the appropriate sanction for her violations.

Additionally, Kurtz and Plaintiffs' other trial counsel did not withdraw their appearances until March 1, 2016 but Defendants filed their motion for judgment as a matter of law on

February 3, 2016. *See* Doc. 431. In this motion, Defendants renewed their prior motion for sanctions, putting Kurtz on notice at least three weeks prior to her withdrawing her appearance.

Finally, during the February 16, 2016 status hearing, the Court reminded Kurtz that the issue of the appropriate sanctions for her trial misconduct was still pending and that the Court was seriously considering striking the judgment and finding for Defendants on all claims. Therefore, Kurtz was clearly on notice that she and her clients were facing sanctions for the misconduct at trial.

Even if none of the above listed events occurred, Plaintiffs, who actually bear the consequences of the sanction, have not been deprived of any notice or of their opportunity to fully respond. Plaintiffs' current counsel's argument that he cannot respond to Plaintiffs' prior counsel's "actions, inactions, or subjective intent" is both inaccurate and beside the point. First, the City does not raise any examples of misconduct that are not supported by the record. The vast majority of the violations are plain on their face: hearsay statements, violations of MILs, and misleading statements to the Court. These do not require any additional information possessed solely by former counsel. The Court is not aware of what could be gained by knowing more about former counsel's "subjective intent" when carrying out these actions; the record is clear and sufficient for the Court to make the findings discussed in detail above. Additionally, the Court notes that Plaintiffs have not indicated that they have even tried to contact Kurtz to obtain information they seem to believe is necessary but unavailable. There is no reason to suspect that Kurtz would not assist in providing it when she is fully aware of the stakes. Therefore, this argument carries no weight.

Finally, Plaintiffs argue that before dismissing a case, the Court "must explicitly warn of the consequences of a specific action." Doc. 480 at 9. This misstates the law and the record in

this case.  The Court is not required to warn a party that egregious misconduct will result in dismissal and regardless, the Court provided numerous warnings to Plaintiffs and their counsel in this case.

The only support Plaintiffs cite for the proposition that a warning must be given is *Graham v. Schomaker*, 215 F.3d 1329, (table) 2000 WL 717093 at *3 (7th Cir. 2000), an unpublished, non-precedential opinion, which is at odds with all other cases on this issue.  The *Graham* court states that a court "must explicitly warn of the consequences of a specific action" before dismissing a case.  *Id.*  The actual controlling standard is that a warning is only required in cases of ordinary misconduct where the plaintiff is *pro se*.  *McInnis v. Duncan*, 697 F.3d 661, 665 (7th Cir. 2012).  There is no such requirement where the conduct is severe and the party is represented.  *See Matter of Bluestein & Co.*, 68 F.3d 1022, 1026 (7th Cir. 1995) (citing *Ball*, 2 F.3d at 756).

Nevertheless, the Court provided numerous warnings to Kurtz that her conduct was likely to lead to sanctions, including dismissal, if she persisted.  *See* Tr. 207:23–209:16, 277:11–278:8, 279:16–280:6, 296:15–296:25, 318:19–320:2, 361:15–364:25, 919:11–925:3, 1520:14–1524:23. Furthermore, in *Rojas*, the Seventh Circuit effectively warned Kurtz that continued misconduct in federal courts would be met with more severe sanctions.  *Rojas*, 775 F.3d at 910.  Plaintiffs and their counsel were thus on notice and amply warned that continued transgressions could lead to a severe sanction, including dismissal or judgment.

Therefore, for the reasons stated above entry of judgment in favor of the City and Szura is the appropriate sanction in this matter.

## II.    Attorney's Fees

The City and Szura also ask the Court to award attorneys' fees as a sanction.  The Court declines to do so.  The Court finds that entry of judgment is a sufficiently harsh sanction for the conduct at issue.  Furthermore, the vast majority of attorney resources in this case were expended in defense of the non-frivolous claims brought by Plaintiffs.  Under the "American Rule," parties bear the cost of the litigation absent a fee-shifting statute unless the other party "acted in bad faith, vexatiously, wantonly, or for oppressive reasons."  *F.D. Rich Co. v. United States*, 417 U.S. 116, 129, 94 S. Ct. 2157, 2165, 40 L. Ed. 2d 703 (1974).  While Plaintiffs' counsel did act in bad faith at trial, Plaintiffs did not bring the underlying claims in bad faith.  Therefore the Court finds it is unnecessary to award attorneys' fees to Defendants to cover costs they would have incurred regardless of Kurtz's bad faith.

## III.   Szura's Motions to Join

Szura filed two motions to join: one for the motion for judgment as a matter of law and one for the motion for sanctions.  Plaintiffs opposed the former motion only in a footnote. Arguments raised only in footnotes are waived.  *See Schrock v. Learning Curve Int'l, Inc.*, 744 F.Supp.2d 768, 770 (N.D. Ill. 2010) ("Undeveloped arguments and arguments raised in footnotes are waived." (citing *Goren v. New Vision Int'l*, 156 F.3d 721, 726 n. 2 (7th Cir.1998))). Additionally, even if it were not waived, Plaintiffs did not raise any similar objection on the motion for sanctions.  Because the issues raised in the City's sanctions motion and motion for judgment as a matter of law are identical to those that Szura would present, a second set of motions would have been redundant and a further waste of the Court's time.  Furthermore, because the City must indemnify Szura where he has been found to have been acting within the scope of his employment, the only means of giving the City meaningful relief is to enter

judgment in favor of Szura as well. Therefore, in the interest of efficiency and fairness to the City, the Court grants both of Szura's motions to join.

## IV.     Remaining Post-Trial Motions

In addition to the motion for sanctions, the City filed a motion for judgment as a matter of law or relief from judgment and Plaintiffs filed a motion for a new trial. Because the Court is entering judgment in favor of the City and Szura on all of Plaintiffs' claims, the Court denies the remaining motions as moot. *See, e.g.*, *U.S. ex rel. Salmeron v. Enter. Recovery Sys., Inc.*, No. 05 C 4453, 2008 WL 3876135, at *10 (N.D. Ill. Aug. 18, 2008) (declining to review pending dispositive motions where sanction of dismissal rendered them moot), aff'd, 579 F.3d 787 (7th Cir. 2009).

## CONCLUSION

For the foregoing reasons, the Court grants and denies in part the City's motion for sanctions and grants Szura's motion to join. The Court enters judgment in favor of the City and Szura on all claims, and denies the motion with respect to the request for attorneys' fees. The Court denies as moot the City's motion for judgment as a matter of law and Plaintiffs' motion for a new trial.

Dated: September 29, 2016

_____
SARA L. ELLIS
United States District Judge